UNION PACIFIC RAILROAD COMPANY, A CORPORATION, APPELLEE,
v. KAISER AGRICULTURAL CHEMICAL COMPANY, A SUBSIDIARY OF
KAISER ALUMINUM & AGRICULTURAL CHEMICAL CORPORATION,
A CORPORATION, APPELLANT.

425 N.W.2d 872

Filed July 15, 1988.   No. 86-526.

C.L. Robinson, of Fitzgerald & Brown, for appellant.

Jay M. Nadlman for appellee.

HASTINGS, C.J., BOSLAUGH, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.
## UNION PACIFIC-KAISER AGREEMENT
From 1976 and pursuant to its agreement with Kaiser Agricultural Chemical Company, the Union Pacific Railroad Company supplied tracks and service to Kaiser's chemical facility. The trackage agreement, drafted by Union Pacific, included the following provision:

Section 9. LIABILITY.

. . . .

The Industry [Kaiser] agrees to indemnify and hold harmless the Railroad Company for loss, damage or injury from any act or omission of the Industry, its employes or agents, to the person or property of the parties hereto and their employes and agents, and to the person or property of any other person or corporation, while on or about the Track; and if any claim or liability other than from fire shall arise from the joint or concurring negligence of the parties hereto, it shall be borne equally by the parties at fault.

## NATURE OF APPEAL
Based on its agreement with Kaiser, Union Pacific sued Kaiser on account of the railroad's settlement of claims which arose out of a train-vehicle collision in which one of Kaiser's customers sustained property damage and a Kaiser employee sustained bodily injury.

In its amended petition, Union Pacific claimed that injuries

to Kaiser's employee and property damage to Kaiser's customer were "caused by negligent acts or omissions" of Kaiser, specifically alleged Kaiser's "negligent" conduct, such as failure to provide precautionary measures to avoid or prevent the accident, and asserted that Kaiser "knew, or should have known, in the exercise of ordinary care" that its conduct created an unreasonable risk of harm to Kaiser's employee who was hurt in the accident. Union Pacific's petition concluded with a prayer for indemnification of $95,000.

Kaiser answered, denied it was negligent, and alleged that any damages from the accident were caused by Union Pacific's active negligence in contrast with Kaiser's negligence, which was passive only.

Each party moved for summary judgment to dispose of the liability question under their agreement. Finding that Union Pacific was "entitled to contribution" pursuant to the agreement with Kaiser, the district court granted summary judgment to the railroad, overruled Kaiser's motion for summary judgment, and, in a subsequent bench trial, determined that the settlements achieved by Union Pacific were reasonable and in good faith. Because Union Pacific had "admitted some negligence" regarding the accident, the district court concluded that Union Pacific was "entitled to indemnification of 50 percent of the settlements rather than for full indemnity" and awarded a $47,500 judgment to the railroad.

Kaiser contends that Neb. Rev. Stat. § 48-148 (Reissue 1984) of the Nebraska Workers' Compensation Act immunizes Kaiser from liability outside the compensation act concerning an injury to a Kaiser employee, and, therefore, Kaiser is not liable to Union Pacific under the indemnity agreement for rail service. Kaiser also contends that there is no negligence on its part which renders Kaiser liable for indemnification under the agreement with Union Pacific. Finally, Kaiser claims that the settlements by Union Pacific were not reasonable and in good faith. Union Pacific contends the issue of negligence is irrelevant to recovery under the indemnity agreement with Kaiser.

A summary judgment is properly granted when the

pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue concerning any material fact or the ultimate inferences deducible from such fact or facts and that the moving party is entitled to judgment as a matter of law. *Wibbels v. Unick, post* p. 184, 426 N.W.2d 244 (1988); *Lowry v. State Farm Mut. Auto. Ins. Co.*, 228 Neb. 171, 421 N.W.2d 775 (1988). In appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. See *Ford v. American Medical International*, 228 Neb. 226, 422 N.W.2d 67 (1988).

## THE ACCIDENT

Trucks at Kaiser were loaded through doorways or docks on the east side of its building. Two sets of parallel Union Pacific tracks ran through the loading area for a distance of 225 feet along Kaiser's building. The west, or closest, rail of the track used to spot railroad cars at Kaiser's loading docks was 5 feet from Kaiser's building. For a number of years, in loading at Kaiser, drivers had been parking their trucks across the Union Pacific tracks.

On the morning of March 26, 1981, Walter Cunningham, a driver for Corbet, Inc., drove his semi, which included a 42-foot flatbed trailer, to the loading area at Kaiser, where a Kaiser employee told Cunningham to park the semi across the two sets of tracks adjacent to Kaiser's building. Cunningham backed the semi up to one of the doorway-loading docks near the northeast corner of Kaiser's building and parked his rig with approximately 20 feet of the trailer's length across the railroad tracks. To load bags of fertilizer on the trailer, Cunningham and Kaiser's loading crew, including Gerald Blomenkamp, used a conveyor belt to move bags from the building's interior to the semi for stacking on the trailer. Around 12:15 p.m., while Kaiser's employees were on their lunch break, Cunningham sat in the semi's cab, waiting to resume loading the bagged fertilizer. An empty boxcar was standing 10 feet south of the Corbet semi. At this time, but unbeknown to Cunningham, the crew of a Union Pacific switch engine was entering Kaiser's premises from the south to remove empty boxcars at Kaiser. As

the switch engine coupled onto the boxcar near the semi, the boxcar was pushed or "bumped" into the Corbet rig, moving the trailer an "inch and a half." Afterward, as Cunningham related: "[T]he brakeman come on back and said we're sorry about that, poor communications with his walkie-talkie or two-way . . . ."

About that time, which was around 12:30 p.m., the Kaiser loading crew returned from lunch. A Union Pacific crewman told David Moyer, leadman for the Kaiser crew, that the boxcar had collided or bumped into the semi. After the Union Pacific crewman, Cunningham, and Moyer had determined there was no damage to the semi, the switch engine and its crew left with the boxcar which had collided with the trailer. The semi remained in its loading position and location at Kaiser's dock. Moyer knew that the switch engine would return later that day, because he had told the engine crew where to spot cars after the empty was removed. The switch engine's engineer did not realize that the boxcar had struck the trailer. None of the train crew informed the engineer about the collision. Kaiser had no safety rules governing trucks parked on Union Pacific's tracks or any warning procedure for "trains in the vicinity," but did have a "general practice" of maintaining a 30-foot interval between a spotted car and a truck at the loading dock.

About 12:45 p.m., the same Union Pacific train crew which was involved in the collision half an hour earlier returned on a switch engine pushing a string of railroad cars for Kaiser. Approach of the train went unnoticed by Cunningham and Kaiser's loading crew on the flatbed trailer until the first boxcar, being shoved at 15 miles per hour—an "unusually fast" speed—was 20 feet from the semi. The record does not disclose the speed at which cars are usually moved on the track beside Kaiser's building for spotting at the loading docks. Cunningham remained on the trailer as the boxcar neared. Of Kaiser's employees, all except Blomenkamp were able to scramble from the trailer. In his attempt to leave the trailer, Blomenkamp became pinned between the conveyor and the side of the trailer and was in that position when the boxcar struck the trailer. The collision caused extensive damage to Corbet's trailer and serious bodily injury to Blomenkamp.

William E. Harrings, engine foreman for spotting cars at Kaiser, was riding "on the point" at the northeast corner of the boxcar approaching the parked semi. When the boxcar was about four car lengths from the semi, Harrings swung down from the side ladder's still step and walked beside the moving boxcar. Harrings failed to warn those on the trailer while the train was approaching. According to Harrings, who was using a hand-held radio or walkie-talkie, "I tried to get him [the engineer] to stop, we didn't stop." Harrings never utilized any hand signal to the engineer. Roger Bergantzel, a switchman who had been riding the point on the lead boxcar at the time of the first collision, was also on the ground beside the moving cars and acknowledged that hand signals could have been used, but were not, to communicate with the engineer.

As the result of the collision, Blomenkamp received benefits paid pursuant to the Nebraska Workers' Compensation Act, Neb. Rev. Stat. §§ 48-101 et seq. (Reissue 1984).

In answers to Kaiser's interrogatories about the railroad's negligence in the second collision at Kaiser, Union Pacific admitted that, under the circumstances existing at the time of the accident, the railroad's "operating rules" required a train's movement to be such that the train could be stopped to avoid striking any obstruction. Union Pacific then acknowledged that Harrings and the engineer of the switch engine were fired as a consequence of their violating railroad rules applicable at the time of the second collision at Kaiser.

On the foregoing facts, the district court found that Kaiser was contractually obligated to contribute to the settlements obtained by Union Pacific on the Corbet and Blomenkamp claims. Subsequently, at a trial to determine the amount of Kaiser's contribution, the parties adduced evidence bearing upon reasonableness and good faith concerning amounts paid by Union Pacific in settlement of the claims connected with the collision at Kaiser. The court entered judgment for Union Pacific, requiring that Kaiser contribute and reimburse $47,500 to Union Pacific on account of the settled claims.

## WORKERS' COMPENSATION ACT AND KAISER'S LIABILITY FOR INDEMNIFICATION OR CONTRIBUTION

In claiming immunity from liability for indemnification or contribution pertaining to Union Pacific's settlement of Blomenkamp's personal injury claim, Kaiser directs our attention to the Nebraska Workers' Compensation Act and then points out that this court, in *Vangreen v. Interstate Machinery & Supply Co.*, 197 Neb. 29, 246 N.W.2d 652 (1976), left undecided the question whether an employer may contractually waive an employer's exclusive liability existing as the result of the Workers' Compensation Act. Kaiser contends an employer cannot waive the exclusive liability provision found in § 48-148 of the Nebraska Workers' Compensation Act, which provides:

> If any employee, or his dependents in case of death, of any employer subject to the provisions of sections 48-109 to 48-147 files any claim with, or accepts any payment from such employer, or from any insurance company carrying such risk, on account of personal injury, or makes any agreement, or submits any question to the court under said sections, such action shall constitute a release to such employer of all claims or demands at law, if any, arising from such injury.

Section 48-118 of the Nebraska Workers' Compensation Act provides an employer's subrogation interest in a recovery from a third-party tort-feasor concerning a claim for injury or death of an employee of the subrogated employer.

As construed by Kaiser, § 48-148 releases an employer from "all claims or demands at law" arising from an employee's injury. Therefore, Kaiser argues, it cannot be held liable to Union Pacific for indemnification or contribution on account of the settlement with Blomenkamp, Kaiser's employee.

In *Vangreen v. Interstate Machinery & Supply Co., supra*, Vangreen sued Interstate to recover for bodily injury sustained when Vangreen injured his hand while installing glass in a building. In view of its subrogation interest under the Workers' Compensation Act, Vangreen's employer was a party to the action. Interstate settled with Vangreen and filed a "cross-claim" against Vangreen's employer, seeking indemnification or contribution on the ground that the employer's negligence was the proximate cause of Vangreen's

damages. Holding that Interstate's action was barred as a result of the Workers' Compensation Act, this court stated in *Vangreen*:

> The great majority of the various jurisdictions dealing with the question have held that a third person tort-feasor, who is liable for injuries to, or for the death of, a workman, is not entitled to recover contribution from the workman's employer, notwithstanding the latter's negligence concurred in causing the injury or death, where the employer, the employee, and the injury or death are covered by the provisions of a workmen's compensation act. The decisions are based on two theories. First, that an employer covered by a compensation act does not have a common liability with a third party tort-feasor which is a necessary requisite to securing contribution. Second, that compensation acts must be construed as specifically limiting the liability of the employer, not only to the employee, but as to third persons as well. This proposition has, in some circumstances, been applied to the theory of indemnity as well as that of contribution.

197 Neb. at 31, 246 N.W.2d at 653-54.

In considering whether Interstate was entitled to indemnity, the *Vangreen* court stated:

> Interstate does not urge a right to recover under an express or implied contract of indemnity but seeks recovery on the theory that PPG is a joint tort-feasor. Under such circumstances, is the exclusive-remedy provision contained in the Nebraska statutes circumvented? The statute, § 48-148, R.R.S. 1943, provides that a workmen's compensation action "shall constitute a release to such employer of all claims or demands at law, if any, arising from such injury." Section 48-118 . . . awards to the employer subrogation rights against third parties. It is evident that the exclusive-remedy provision is not confined to the injured party but is designed to cover all claims "arising from such injury." Interstate's cross-claim is based on negligence and necessarily arises from the injury. The statute is not limited to claims for damages and it will not avail to assert that this is a claim for indemnity

rather than damages.

The majority rule holds that, when the relation between the parties involves "no contract or special relation capable of carrying with it an implied obligation to indemnify, the basic exclusiveness rule generally cannot be defeated by dressing the remedy itself in contractual clothes, such as indemnity, since what governs is not the delictual or contractual form of the remedy but the question: is the claim 'on account of' the injury, or on account of a separate obligation running from the employer to the third party?"

197 Neb. at 32-33, 246 N.W.2d at 654 (quoting 2A A. Larson, The Law of Workmen's Compensation § 76.44 (1975)).

Unlike the situation in *Vangreen v. Interstate Machinery & Supply Co.*, 197 Neb. 29, 246 N.W.2d 652 (1976), the case before us involves an action based on an agreement for indemnification or contribution for a loss sustained by Union Pacific as a result of "any act or omission" of Kaiser, including a loss from the joint or concurring negligence of Union Pacific and Kaiser.

The exclusive liability provision of workers' compensation acts, such as the provision contained in § 48-148 of the Nebraska Workers' Compensation Act, is discussed in 2A A. Larson, The Law of Workmen's Compensation § 76.42 at 14-734 (1988): "The clearest exception to the exclusive-liability clause is the third party's right to enforce an express contract in which the employer agrees to indemnify the third party for the very kind of loss that the third party has been made to pay to the employee."

As Larson explains:

[T]he immunity conferred is only against actions for damages on account of the employee's injury; a third party's action for indemnity is not exactly for "damages" but for reimbursement, and it is not "on account of" the employee's injury, but on account of breach of an independent duty owed by the employer to the third party.

2A A. Larson, *supra*, § 76.41 at 14-733 and 14-734.

Accordingly, the vast majority of jurisdictions have adopted the rule that, as a consequence of an agreement for

indemnification or contribution, an employer within the purview of a workers' compensation act may be liable to a third party concerning injuries to the employer's employee; for example, see, *Barsness v. General Diesel & Equipment*, 422 N.W.2d 819 (N.D. 1988) (majority rule: An express contract of indemnification is an exception to the workers' compensation act's exclusive remedy rule); *Ramos v. Browning Ferris Industries*, 103 N.J. 177, 510 A.2d 1152 (1986) (New Jersey's workers' compensation act did not preclude an employer from assuming a contractual duty to indemnify a third party); *Espaniola v. Cawdrey Mars Joint Venture*, ____ Haw. ____, 707 P.2d 365 (1985) (an employer covered by the workers' compensation law may be liable to a third party for a loss indemnified by an agreement with the employer); *Manson-Osberg Company v. State*, 552 P.2d 654 (Alaska 1976).

We find nothing in the Nebraska Workers' Compensation Act, by express provision or implication, and nothing in the public policy of the State of Nebraska, which prevents an employer's contractual obligation to indemnify a third party concerning a loss sustained through the third party's payments to the indemnitor's employee. Therefore, we now hold that when an employer, liable to an employee under the Nebraska Workers' Compensation Act, agrees to indemnify a third party for a loss sustained as the result of the third party's payment to the indemnitor's employee, the employer's exclusion from liability accorded by the Workers' Compensation Act does not preclude the third party's action to enforce the indemnity agreement with the indemnitor-employer. The Union Pacific-Kaiser agreement contains no specific provision or language which excludes, exempts, or exonerates Kaiser from liability for indemnification or contribution as a contractual duty. We decline to rewrite the agreement between Union Pacific and Kaiser and insert a contractual provision precluding Kaiser's liability for indemnification or contribution concerning Union Pacific's settlement with Kaiser's employee, Blomenkamp. Kaiser's claim that the Nebraska Workers' Compensation Act provides exclusive liability and, therefore, immunizes Kaiser from Union Pacific's action to enforce the agreement for indemnification or contribution is without

merit.

## LIABILITY UNDER THE INDEMNITY AGREEMENT
### Terms of Agreement

Kaiser contends that its liability for indemnification or contribution exists only when Kaiser has negligently caused the loss covered in its agreement with Union Pacific. Liability for any loss, Kaiser argues, must be ascertained by application of principles governing liability for common-law negligence.

Union Pacific counters that "Kaiser has failed to recognize that Union Pacific's claim for relief was grounded on contract, not common law negligence. The doctrine of proximate cause, and the theory that an independent actor breaks the chain of causation, are irrelevant to a contractual action for relief." Brief for appellee at 7.

An indemnity agreement is a contract to be construed according to the principles generally applied in construction or interpretation of other contracts. *Peter Kiewit Sons Co. v. O'Keefe Elevator Co., Inc.*, 191 Neb. 50, 213 N.W.2d 731 (1974); *First Trust Co. v. Airedale Ranch & Cattle Co.*, 136 Neb. 521, 286 N.W. 766 (1939).

> A court is not free to speculate about terms absent from a written contract. [Citation omitted.] Where the parties have clearly expressed an intent to accomplish a particular result, it is not the province of a court to rewrite a contract to reflect the court's view of a fair bargain. [Citations omitted.] On the other hand, a court will construe uncertain, indefinite, or ambiguous terms in a written contract. [Citations omitted.] In *Denis v. Woodmen Acc. & Life Co.*, 214 Neb. 495, 498, 334 N.W.2d 463, 465 (1983), we stated that "absence of articulation accounts for ambiguity" and held that where a questioned clause in a written contract may be fairly interpreted in more than one way, there is ambiguity to be resolved by a court as a matter of law. When contractual language is ambiguous, a court will construe such language against the party preparing the contract . . . . [Citations omitted.]

*Craig v. Hastings State Bank*, 221 Neb. 746, 750, 380 N.W.2d 618, 621 (1986).

In the Union Pacific-Kaiser agreement prepared by the

railroad, the obligation for complete indemnification is expressed in the terms "any act or omission," while the obligation for partial indemnification or contribution is couched in language utilized in aspects of common-law negligence, namely, "joint or concurring negligence of the parties."

To activate the indemnity clause in the Union Pacific-Kaiser agreement, what is the nature of the omission required to render Kaiser liable for indemnification? Intentional omission? Negligent omission? Or any type of omission for any reason? *Omission* means "apathy toward or neglect of duty . . . something neglected or left undone." Webster's Third New International Dictionary, Unabridged 1574 (1981). As a verb, *neglect* means "to fail to attend to sufficiently or properly: not give proper attention or care to . . . to carelessly omit doing (something that should be done) either altogether or almost altogether: leave undone or unattended to through carelessness or by intention . . . ." *Id.* at 1513. Consequently, an omission usually or generally involves a careless failure to perform some duty. Whatever duty is enjoined on Kaiser under the indemnity agreement, there is no standard specified in the agreement whereby one may determine the type of omission and occurrence of that omission which subject Kaiser to liability for indemnification or contribution. Concerning a document, *construction* includes the process of determining the correct sense, real meaning, or proper explanation of an ambiguous term, phrase, or provision in a written instrument. *In re Estate of Walker*, 224 Neb. 812, 402 N.W.2d 251 (1987). *Omission*, as used in the indemnity clause of the Union Pacific-Kaiser agreement, is an uncertain, indefinite, or ambiguous term fairly interpreted in more than one way. To resolve such ambiguity arising from *omission* in the indemnity agreement in question, we construe *omission* to mean a neglect to perform what is required by the common law pertaining to negligence or, simply, a negligent failure regarding a duty. To warrant partial indemnification or contribution, the Union Pacific-Kaiser agreement expressly refers to negligence as the determinant, leaving no uncertainty or ambiguity concerning the applicable standard to determine whether the railroad is entitled to a

recovery under the agreement. While Union Pacific tells us that its claim against Kaiser depends on contract law only, that is not what Union Pacific informed the trial court, when the railroad alleged that its losses were "caused by the negligent acts or omissions" of Kaiser, meticulously described Kaiser's "negligent" conduct, and condemned such conduct, since Kaiser "knew, or should have known, in the exercise of ordinary care" that Kaiser's condemned conduct created an unreasonable risk of harm to Blomenkamp, Kaiser's employee who was hurt in the accident. Speaking in euphemistic terms, we believe Union Pacific's theory on appeal is incongruous with its theory asserted at trial. "The Supreme Court disposes of an appeal on the basis of the theory presented by the pleadings on which the case was tried." *Holden v. Urban*, 224 Neb. 472, 474, 398 N.W.2d 699, 701 (1987). See, also, *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987); *Foltz v. Northwestern Bell Tel. Co.*, 221 Neb. 201, 376 N.W.2d 301 (1985). Consequently, our construction of the indemnification clause or provision in the Union Pacific-Kaiser agreement is neither strained nor unreasonable. Union Pacific obviously used the same construction as we have regarding *omission*, because the railroad pleaded actionable negligence as the premise for indemnification from Kaiser. Although Union Pacific has tried to sidetrack us into disposing of this case on contractual provisions alone, the real question concerns Kaiser's conduct and negligence which make the indemnity provisions operative under the trackage agreement.

*Negligence*

We stated in *Holden v. Urban, supra* at 474-75, 398 N.W.2d at 701:

> For actionable negligence there must be a defendant's legal duty to protect the plaintiff from injury, a failure to discharge that duty, and damage resulting from such undischarged duty. [Citations omitted.]
>
> " '[D]uty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. . . .

"A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Prosser and Keeton on the Law of Torts, *Limited Duty* § 53 at 356 (5th ed. 1984).

Foreseeability is a factor in establishing a defendant's duty, or, as expressed by Justice Cardozo in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 394, 111 N.E. 1050, 1054 (1916): "[F]oresight of the consequences involves the creation of a duty . . . ." See, also, *Lock v. Packard Flying Service, Inc.*, 185 Neb. 71, 73, 173 N.W.2d 516, 518 (1970): " 'Foresight, not retrospect, is the standard of diligence. . . .' " (Citing and quoting from *Kolar v. Divis*, 179 Neb. 756, 140 N.W.2d 658 (1966).)

As noted in 4 F. Harper, F. James & O. Gray, The Law of Torts § 20.5 at 138 (2d ed. 1986):

The view currently prevailing in this country [limits] the scope of the duty to do or refrain from doing a given act to (1) those persons that are likely to be endangered by the act or omission, and (2) harm (to such person or interest) from a risk the likelihood of which made the act or omission negligent.

" 'The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it.' " *Saporta v. State*, 220 Neb. 142, 149, 368 N.W.2d 783, 787 (1985). See, also, *Prime Inc. v. Younglove Constr. Co.*, 227 Neb. 423, 418 N.W.2d 539 (1988).

" ' "The proximate cause of an injury is that cause which, in natural and continuous sequence, unaccompanied by any efficient, intervening cause, [produces the injury,] and without which the result would not have occurred. . . ." ' " *Zeller v. County of Howard*, 227 Neb. 667, 672, 419 N.W.2d 654, 658 (1988) (quoting *Starlin v. Burlington Northern, Inc.*, 193 Neb. 619, 228 N.W.2d 597 (1975)).

As expressed in Prosser and Keeton on the Law of Torts, *Proximate Cause* § 42 at 274 (5th ed. 1984): "It is quite possible to state every question which arises in connection with 'proximate cause' in the form of a single question: was the

defendant under a duty to protect the plaintiff against the event which did in fact occur?"

Concerning proximate causation, we have held:

" 'There are three basic requirements in establishing proximate cause. The first requirement is that the negligence be such that "without which the injury would not have occurred," commonly known as the "but for" rule. . . .

" 'The second requirement is that the injury be the natural and probable result of the negligence. . . .

. . . .

" 'The third requirement is that there be no efficient intervening cause.' "

*Zeller, supra* at 672, 419 N.W.2d at 658 (quoting *Daniels v. Andersen*, 195 Neb. 95, 237 N.W.2d 397 (1975)).

Many courts have said that the defendant is liable only if the harm suffered is the "natural and probable" consequence of the defendant's act. These words frequently appear to have been given no more definite meaning than "proximate" itself. Strictly speaking, all consequences are "natural" which occur through the operation of forces of nature, without human intervention. But the word, as used, obviously appears not to be intended to mean this at all, but to refer to consequences which are normal, not extraordinary, not surprising in the light of ordinary experience. "Probable," if it is to add anything to this, must refer to consequences which were to be anticipated at the time of the defendant's conduct. The phrase therefore appears to come out as the equivalent of the test of foreseeability, of consequences within the scope of the original risk, so that the likelihood of their occurrence was a factor in making the defendant negligent in the first instance.

Prosser and Keeton, *supra*, § 43 at 282.

In *Zeller v. County of Howard, supra*, we also stated: "In negligence law, an efficient intervening cause is new and independent conduct of a third person, which itself is a proximate cause of the injury in question and breaks the causal connection between original conduct and the injury. [Citations

omitted.]" 227 Neb. at 673, 419 N.W.2d at 658. See, also, *Delaware v. Valls*, 226 Neb. 140, 409 N.W.2d 621 (1987).

" ' " 'The causal connection is broken if between the defendant's negligent act and the plaintiff's injury "there has intervened the negligence of a third person who had full control of the situation and whose negligence was such as the defendant was not bound to anticipate and could not be said to have contemplated, which later negligence resulted directly in the injury to the plaintiff." ' " ' " *Shelton v. Board of Regents*, [211 Neb. 820, 320 N.W.2d 748 (1982)] (quoting from *Coyle v. Stopak*, 165 Neb. 594, 86 N.W.2d 758 (1957)). See, also, *Shupe v. County of Antelope*, 157 Neb. 374, 59 N.W.2d 710 (1953).

*Zeller v. County of Howard, supra* at 673-74, 419 N.W.2d at 658.

If the likelihood of the intervening act was one of the hazards that made defendant's conduct negligent—that is, if it was sufficiently foreseeable to have this effect—then defendant will generally be liable for the consequences; otherwise he will generally not be, provided, of course, that the intervening force is a cause of the injury.

4 F. Harper, *supra*, § 20.5 at 152.

"Determination of causation is, ordinarily, a matter for the trier of fact." *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 778, 408 N.W.2d 280, 285 (1987). See, also, *Zeller v. County of Howard, supra.*

To determine whether conduct constitutes negligence, the invariable standard is reasonable care, although reasonable care is directly proportional to the danger inherent in conduct and may vary depending on the circumstances. *Prime Inc. v. Younglove Constr. Co.*, 227 Neb. 423, 418 N.W.2d 539 (1988).

When the foregoing principles of negligence law are applied in the present case, several questions arise.

What bearing did the first collision have on the conduct of the parties? In view of the first collision, and given the same people and the same setting of the semi still parked across the track, did Kaiser act reasonably, believing that Union Pacific could handle it and would stop short of a second collision within minutes of the first collision? Under the circumstances,

was a second collision so bizarre and improbable to the point of being nothing but the most remote possibility? Was recurrence of a collision unlikely in a degree defying foreseeability? On the other hand, was the first collision a dress rehearsal for the second? As a result of the first collision, should Kaiser have reasonably anticipated a second collision? If so, what precautionary measures would have been reasonably required to prevent the second collision? Still other questions lurk in the record. At the time of the second collision, the switch engine was pushing cars at a speed of 15 miles per hour, which translates into 22 feet per second, just before impact. At that "unusually fast" speed, if Kaiser were negligent in omitting precautions against the second accident, would Kaiser's precautions, which probably would have been formulated on the basis of the usual speed of cars being spotted, have made any difference at all? Would the train's "unusually fast" speed have frustrated reasonable precautionary measures by Kaiser? The Union Pacific fired the engineer of the switch engine, acknowledging the engineer did not have the train under control to avoid striking an obstruction. If the engine was backing toward the loading dock and pushing cars, the engineer would have been seated on the west side of the engine and may have had an obstructed view of the area ahead of the boxcars and may not have had visual contact with members of the train crew on the ground. The engine foreman and switchman, located on the ground at the east side of the moving train, had only malfunctioning walkie-talkies, preventing effective radio contact with the engineer. Hand signals were not used and, even if used, as far as the record indicates, probably would not have been observed by the engineer seated on the west side of the switch engine. In that setting, if Kaiser had attempted to warn the train crew, could the warning have been communicated to the engineer in time to stop the train moving at an "unusually fast" speed? Was the engineer incommunicado in the cab, oblivious to what lay ahead of the moving train?

Those are some of the genuine issues of material fact presented and, consequently, factual questions raised by the record which we have reviewed. We conclude that the district court was incorrect in granting a summary judgment to Union

Pacific, and reverse the Union Pacific's summary judgment.

## JUDGMENT FOR CONTRIBUTION

Because there are issues of fact to be determined for resolution of the question whether Kaiser was negligent, a judgment necessarily based on Kaiser's negligence is premature. Therefore, since we have reversed the district court's judgment on the issue of negligence, we must also reverse the district court's judgment requiring Kaiser's contribution toward Union Pacific's settlement of the claims arising out of the collision in question.

## DENIAL OF SUMMARY JUDGMENT TO KAISER

Kaiser complains that the district court denied Kaiser's motion for summary judgment. In view of the principles governing negligence claims and the issues of fact which we have discussed regarding the summary judgment for Union Pacific, we need say no more than the district court was correct in denying summary judgment to Kaiser. Moreover, with reversal of the judgment for contribution, the trial court's action in denying a summary judgment to Kaiser presents no appealable order. See *Cockle v. Cockle*, 215 Neb. 329, 339 N.W.2d 63 (1983) (overruling a motion for summary judgment is not a final, appealable order).

For the reasons given, we reverse the district court's summary judgment granted to Union Pacific and reverse the district court's judgment requiring Kaiser's contribution to Union Pacific on account of the railroad's settlements. This matter is remanded to the district court for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.