RONALD M. HASELHORST AND JANET M. HASELHORST, HUSBAND
AND WIFE, ET AL., APPELLEES, V. STATE OF NEBRASKA ET AL.,
APPELLANTS.

485 N.W.2d 180

Filed June 12, 1992.    No. S-91-058.

Don Stenberg, Attorney General, Royce N. Harper, and Craig L. Nelson for appellants.

Herbert J. Friedman, of Friedman Law Offices, and W. Travis Burney for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

This is an action for damages against the State of Nebraska, the Nebraska Department of Social Services (DSS), and DSS Director Daryl Wusk, under the State Tort Claims Act, Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 1987). The petition sought recovery for injuries sustained by the plaintiffs, four children and their parents, arising out of the negligent placement of a foster child in their home and the resulting damage to all the plaintiffs.

Following a trial before the court, judgment was entered on December 13, 1990, in favor of the plaintiffs. The trial court found that the agents of the State were negligent, that the defense of assumption of risk was not applicable, that the plaintiffs were not guilty of contributory negligence sufficient to bar recovery, that the actions of the foster child were not an independent intervening cause, and that the proximate cause of the plaintiffs' damage was the negligence of the State and its agents.

The trial court awarded Ronald M. Haselhorst, the father of the children, special damages in the sum of $97,916.60 and general damages in the sum of $50,000. The court awarded Janet M. Haselhorst, Ronald's wife and the mother of the children, general damages in the sum of $50,000. The court awarded the parents, "as parents and next friends," $100,000 for each of the four minor children, for a total of $400,000. The total judgment for the family was $597,916.60.

The State and its agents have appealed the judgment and assign eight errors, which may be consolidated into six. The State and its agents contend that the trial court erred (1) in

finding the State negligent in three different respects; (2) in holding that the defense of assumption of risk was not applicable; (3) in finding that the plaintiff parents were not guilty of contributory negligence; (4) in finding that the placement of the foster child and the handling of an incident on May 2, 1984, were the proximate causes of plaintiffs' injuries; (5) in failing to find that the criminal acts of the foster child, together with the lack of supervision of the parents, were not an intervening cause; and (6) in awarding excessive damages. We affirm.

The trial court's findings of fact in a proceeding under the State Tort Claims Act, § 81-8,209 et seq., will not be set aside unless such findings are clearly incorrect. *Koncaba v. Scotts Bluff County*, 237 Neb. 37, 464 N.W.2d 764 (1991).

In a bench trial of a law action, the court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Zeller v. County of Howard*, 227 Neb. 667, 419 N.W.2d 654 (1988). In reviewing a judgment awarded in a bench trial, an appellate court does not reweigh the evidence but considers the judgment in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Id.*

When viewed in that light, the record shows the following facts: In the fall of 1983, Ronald and Janet Haselhorst were licensed by the State of Nebraska as foster parents. They had no prior experience in foster care. On February 26, 1984, the foster child, a 15-year-old boy, was placed in the Haselhorst home. The boy was the Haselhorsts' first foster child.

The DSS administrative rules required DSS to obtain all medical and psychological reports on all of its wards. The placement agreement entered into between the Haselhorsts and DSS required that the information contained in the foster child's records be shared with the Haselhorsts.

Medical records obtained for the purpose of trial showed that the foster child had been admitted to the St. Joseph Center for Mental Health in Omaha, Nebraska, on December 9, 1981, because he had attacked his mother on several occasions. On one occasion when his mother was pregnant, the foster child

threatened to kill his mother's unborn child with a knife. The foster child remained in inpatient treatment until February 22, 1982.

Although DSS was aware of the foster child's treatment at St. Joseph's, DSS never obtained the records from St. Joseph's. DSS informed the Haselhorsts that the foster child had been hospitalized at St. Joseph's. DSS, however, did not tell the Haselhorsts the reason for his hospitalization.

Both parents testified that if they had known of the foster child's violent tendencies prior to his placement in their home, they would not have taken him in as a foster child.

On May 2, 1984, when Ronald and Janet returned from a church seminar, they were informed by the babysitter that she had seen the foster child standing with his back to the door of his room and with his pants loose around his hips. One of the Haselhorsts' sons was sitting on the bed facing the foster child. The Haselhorsts immediately called the foster child's caseworker, Michael G. Puls, and demanded that the foster child be removed from their home.

The initial phone conversation between Ronald and Puls took about an hour. Puls told Ronald he would make a few phone calls and call the Haselhorsts back.

Puls called back in approximately one-half hour and related to Ronald a conversation he purportedly had had with Dr. Barbara Sturgis, a psychiatrist from Monroe Mental Health Center. Puls related that Sturgis had had a case concerning a similar incident between two brothers and that Sturgis thought the incident might have been normal boyish curiosity. Puls felt the case Sturgis had handled was similar to the Haselhorst situation. Ronald testified that this conversation led him to believe that Puls had actually discussed the incident in the Haselhorst home with a health care professional. Puls testified that he did not call or discuss the Haselhorsts' situation with Sturgis or any other doctor.

In the afternoon of May 3, 1984, Puls visited the Haselhorst home. Although the Haselhorsts had packed the foster child's bags in preparation for his removal from their home, Puls convinced the Haselhorsts that they should keep the foster child in their home. Puls did not talk to the foster child, the

Haselhorsts' son, or the babysitter regarding the suspicious incident, nor did he inform the Haselhorsts of the foster child's violent history. Furthermore, Puls never attempted to obtain the foster child's records from St. Joseph's.

Puls' supervisor at the time of the foster child's placement with the Haselhorsts admitted that the failure of DSS to obtain the records from St. Joseph's fell below the department's standards. She also admitted that Puls failed to follow DSS standards regarding the May 2, 1984, incident. The applicable DSS standards required that anyone investigating the possibility of child abuse should have talked to the children involved in the incident. According to the supervisor, following the May 2, 1984, incident, DSS should have gone back to look at the foster child's medical and psychological history, but this was never done.

On July 16, 1984, the Haselhorsts' second-oldest son suffered a serious accidental gunshot wound. He was hospitalized from that date through the end of August. Janet testified that she spent considerable time at the hospital with her son and that this diverted her attention from the foster child and her other children.

In the early morning hours of January 9, 1985, a second foster child living in the Haselhorst home found the foster child in the act of sexually abusing the Haselhorsts' oldest son. The incident was immediately referred to the parents. Ronald immediately notified Puls, who removed the foster child from the Haselhorsts' home the next day. The foster child was placed in a foster home where there were no other children. The foster child was placed under the care of Alfredo Ramirez of the Monroe Mental Health Center. When Ramirez found that the foster child had sexually assaulted one of the Haselhorst children, the child was removed from foster care. Later, Ramirez diagnosed the foster child as a pedophile. The foster child was transferred to the Lincoln Regional Center, where he remained for 2 years.

After the January 9, 1985, incident, it was discovered that the foster child had sexually abused each of the Haselhorst children from the beginning of the foster child's placement in the Haselhorst home in late February 1984, when the children

were ages 8, 7, 5, and 4, and that he had continued to do so through the nearly 11 months of his placement. The children testified they were afraid to report the foster child's abuse to their parents because they had been threatened by the foster child. Janet testified that during this time, none of her children reported to her that the foster child was abusing them.

Ramirez provided the Haselhorsts with extensive psychotherapy following the January 9, 1985, incident. He testified that all of the children were suffering from posttraumatic stress disorder and that Ronald and Janet suffered from adjustment disorders due to the violent and prolonged sexual abuse of their children by the foster child. It was his opinion that further extensive psychotherapy was necessary to help resolve the conditions of all the family members.

Prof. Emily Jean McFadden testified on behalf of the plaintiffs as an expert on foster care and the standards applicable to agencies. She testified that national standards set forth by the American Public Welfare Association required that foster parents be informed of a foster child's background. She testified that DSS regulations conformed to these nationally accepted standards and that there was a duty on the part of DSS to make reasonable inquiry as to the foster child's background.

McFadden noted that the foster child had been placed in St. Joseph's because he had been physically abusive toward his mother and because he was threatening to harm her unborn child. In McFadden's opinion, such a child should never have been placed in a foster home, particularly one having small children. McFadden believed that the foster child needed a structured setting such as a residential or group treatment situation where there would be intensive psychological services.

According to McFadden, whether or not there was an incidence of sexual deviation in the foster child's background made no difference. She stated, "It does not make any sense at all to place an older child with a propensity for violence in a home with younger children. The sexual assault is a sexual behavior, but it is just another form of violence."

McFadden stated that DSS knew enough concerning the foster child's psychiatric history at the time of the intake that

the department should have requested a psychological evaluation. McFadden testified that DSS violated its own placement regulations when it placed the foster child with the Haselhorsts and that its failure to make preplacement visits, as required by the national standards, was negligent.

McFadden had the opinion that the Haselhorsts were loving, caring people who were not well trained in foster parenting and that they came from a background where they had no experience with sexual abuse. She testified they did not understand the risk of the situation and were susceptible to the kind of reassurances they were given.

With regard to the allegations of negligence in failing to fully investigate the incident of May 2, 1984, McFadden testified that Puls should have talked to the foster child and the Haselhorst children. That was not done. In this connection, Ranae L. McNeil, a DSS investigator called to testify by the State, testified on plaintiffs' cross-examination that she agreed that the DSS caseworker's investigation of the incident constituted gross negligence.

The State and its agents contend that the trial court erred in finding that the State was negligent in failing to comply with its own standards when it failed to provide the Haselhorsts all the information it had or could have obtained relating to the psychological profile of the foster child; that the State was negligent in failing to adequately investigate the suspicious incident of May 2, 1984; and that the State was negligent in failing to remove the foster child from the home following the May 2 incident. The State and its agents further contend that the trial court erred in finding that these acts of negligence were the proximate cause of the injuries suffered by the Haselhorst family and that the action of the foster child was not an independent intervening cause.

In order to succeed in an action based on negligence, a plaintiff must establish the defendant's duty not to injure the plaintiff, a breach of that duty, proximate causation, and damages. *Zeller v. County of Howard,* 227 Neb. 667, 419 N.W.2d 654 (1988). These four essential elements are matters to be determined by the trier of fact. *Id.*

When we view the evidence in the light most favorable to the

plaintiffs, who prevailed in the trial court, the record substantiates the findings of the trial court.

The DSS program manual which was in force and effect at the time of the placement of the foster child outlined the department's intake standards. Section 5-021.04 states in part as follows:

Local or area office staff shall perform the following intake activities for all wards the unit serves, regardless of where the child is placed:

. . . .

5. Secure all available information such as social history, school, medical, and psychological reports from all available sources;

6. Obtain a medical and social history on the child as soon as possible;

. . . .

8. If the child has just been removed from his/her parent's home, obtain a physical examination for the child within two weeks;

9. Establish a case record containing . . . c. [s]ocial history and summary . . . g. [o]ther applicable information such as - (1) [m]edical records . . . (2) [p]sychological or psychiatric records . . . .

McFadden testified that these standards represent the acceptable national standards for foster care placement and that by failing to obtain the records from St. Joseph's, the department fell below applicable standards. Sharyn Hjorth, a supervisor for DSS, admitted that failure to obtain the St. Joseph's records fell below DSS standards.

Violation of an administrative rule is evidence of negligence, provided an expert witness incorporates the rule in his or her opinion as to an issuable act of negligence and the evidence would probably aid the trier of fact. *Simon v. Omaha P. P. Dist.*, 189 Neb. 183, 202 N.W.2d 157 (1972).

The placement agreement between the plaintiff parents and DSS obligated DSS to share the foster child's medical information with the plaintiffs. McFadden testified that this agreement is consistent with the national standard requiring that foster parents be advised of the foster child's history.

We have said that the proximate cause of an injury is that cause which, in a natural and continuous sequence, without any efficient, intervening cause, produces the injury, and without which the injury would not have occurred. *Zeller v. County of Howard, supra*; *Hegarty v. Campbell Soup Co.*, 214 Neb. 716, 335 N.W.2d 758 (1983).

The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event if the event would have occurred without it. *Greening v. School Dist. of Millard*, 223 Neb. 729, 393 N.W.2d 51 (1986).

Both parents testified that they would not have accepted the foster child in their home if they had been informed about his dangerous propensities. The Haselhorst children would not have been abused by the foster child if DSS had obtained the child's records from St. Joseph's and had shared with the Haselhorsts the information regarding his violent behavior contained therein.

Further, the abuse the Haselhorst children suffered at the hands of the foster child would not have continued past the May 2, 1984, incident if DSS had properly investigated that incident and removed the foster child from the home. The trial court's findings in this regard are supported by the evidence and are not incorrect.

The caseworker, Puls, who visited the Haselhorst home following the suspicious incident of May 2, 1984, admitted that he did not talk to the foster child, the Haselhorst children, or the babysitter about the incident. Instead, he successfully talked Ronald and Janet, who were prepared to have the foster child removed from their home, into allowing the foster child to stay.

Puls' supervisor, Hjorth, admitted that Puls was negligent in his investigation and testified that Puls should have questioned the Haselhorst child and the foster child. Hjorth stated that the standards existing at the time of the May incident required Puls, or anyone investigating the possibility of child abuse, to talk to the children involved. As stated above, McNeil admitted the investigation was done in a grossly negligent manner.

Joan Albin, the district administrator of DSS, admitted that

the foster child should have been referred to psychological counseling following the May incident and that the Haselhorsts should have been informed as to his violent propensity. She also testified that Puls should have questioned the foster child and the affected Haselhorst child.

The State and its agents contend that it was not the negligence of the State that caused the plaintiffs' injuries but, rather, the foster child's abuse of the Haselhorst children which was the intervening cause of their injuries.

This court has defined an efficient intervening cause as " 'a new and independent act, itself a proximate cause of an injury, which breaks the causal connection between the original wrong and the injury. . . . The doctrine that an intervening act cuts off a tort-feasor's liability comes into play only when the intervening cause is not foreseeable.' " (Citation omitted.) *Zeller v. County of Howard*, 227 Neb. at 673, 419 N.W.2d at 658, quoting *Delaware v. Valls*, 226 Neb. 140, 409 N.W.2d 621 (1987).

" 'If the likelihood of the intervening act was one of the hazards that made defendant's conduct negligent—that is, if it was sufficiently foreseeable to have this effect—then defendant will generally be liable for the consequences.' " *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 175, 425 N.W.2d 872, 882 (1988), quoting 4 Fowler V. Harper, Fleming James, Jr., & Oscar S. Gray, The Law of Torts § 20.5 (2d ed. 1986).

In this case, the likelihood of the foster child acting out his violent behavior was the hazard that made the department's conduct negligent in failing to obtain the records from St. Joseph's and sharing that information with the Haselhorsts, in failing to properly investigate the incident of May 2, 1984, and in failing to remove the foster child from the plaintiffs' home following the suspicious incident. The trial court was correct in its determination that the abuse by the foster child was not an efficient intervening cause.

The State and its agents next assign as error the trial court's finding that the defense of assumption of risk was not applicable. The State and its agents argue that the plaintiff parents assumed the risk of the foster child's abuse initially by

accepting him into their home and later by permitting him to remain in their home after the May incident.

In order to prevail on the theory of assumption of risk, the defendant has the burden to establish that the plaintiff (1) knew of the danger, (2) understood the danger, and (3) voluntarily exposed himself or herself to the danger that proximately caused the damage. *Trackwell v. Burlington Northern RR. Co.*, 235 Neb. 224, 454 N.W.2d 497 (1990).

The only knowledge or ability to obtain knowledge of the foster child's dangerous propensities prior to his placement with the plaintiffs rested with DSS. DSS failed to obtain the St. Joseph's records, which revealed the foster child's violent tendencies. Furthermore, DSS failed to inform the plaintiffs of the foster child's past violent behavior, as was required by their placement agreement. Both parents testified that they would not have accepted the foster child in their home if they had been told about his history of violence.

The plaintiff parents were talked into keeping the foster child in their home after the May incident by Puls, who did not properly investigate the matter and misled the Haselhorsts into believing the incident was nothing to worry about. According to McFadden, the plaintiffs, being loving, caring people who were not well trained in foster parenting and who came from a background where they had no experience with sexual abuse, did not understand the risk of the situation and were susceptible to the kind of reassurances they were given by Puls.

The trial court properly rejected the defense of assumption of risk.

The State and its agents also contend that the trial court erred in finding that the plaintiffs were not guilty of contributory negligence sufficient to bar recovery. The State and its agents suggest that the plaintiff parents were contributorily negligent in failing to follow through on an alleged agreement with DSS to monitor the foster child's behavior and in occasionally allowing the foster child to babysit their children following the May 2, 1984, incident.

"Contributory negligence is conduct for which plaintiff is responsible, amounting to a breach of the duty which the law imposes upon persons to protect themselves from injury and

which, concurring and cooperating with actionable negligence on the part of the defendant, contributes to the injury." *Koncaba v. Scotts Bluff County*, 237 Neb. at 39, 464 N.W.2d at 766. A plaintiff is contributorily negligent if "(1) he or she fails to protect himself or herself from injury, (2) his or her conduct concurs and cooperates with the defendant's actionable negligence, and (3) his or her conduct contributes to his or her injuries as a proximate cause." *Horst v. Johnson*, 237 Neb. 155, 161, 465 N.W.2d 461, 465 (1991). Whether contributory negligence is present in a particular case is a question for the trier of fact. *Center State Bank v. Dana, Larson, Roubal & Assoc.*, 226 Neb. 408, 411 N.W.2d 635 (1987).

In July 1984, the Haselhorsts' second-oldest son was severely injured by a gunshot wound. This injury required him to be hospitalized from the time of the shooting until the end of August. After the son returned home from the hospital, DSS continually placed more foster children in the Haselhorst home. Under these circumstances and given the fact that the incident of May 2, 1984, had been minimized by DSS, the plaintiff parents were not negligent in their monitoring of the foster child's behavior.

The Haselhorsts did permit the foster child to babysit their children during the late summer and early fall of 1984; however, he babysat only once or twice a week during a few hours in the afternoons, and other foster children were often present. Furthermore, DSS was aware of the foster child's occasional babysitting and did not caution the Haselhorsts against allowing this activity.

When we view the evidence in a light most favorable to the plaintiff parents, the record supports the trial court's finding that the parents were not contributorily negligent.

For its final assignment of error, the State and its agents complain that the trial court erred in awarding excessive damages and that the award to the parents is not in compliance with standards set in *James v. Lieb*, 221 Neb. 47, 375 N.W.2d 109 (1985).

In *James*, this court set forth the criteria to be met to allow recovery for the emotional distress suffered by a bystander who witnesses or gains knowledge of the death or serious injury of

another proximately caused by the negligence of a defendant. The factors to be considered in determining liability for negligent infliction of emotional distress are not intended to be fixed guidelines but, rather, are factors to be taken into account by the court in assessing the degree of foreseeability of emotional injury to the plaintiff. *Id.*

A bystander may recover for negligent infliction of emotional distress upon proof of marital or intimate familial relationship with a victim who was seriously injured or killed as a result of the proven negligence of a defendant. *Id.*

The State and its agents argue that the parents are not entitled to recover for their emotional distress because the children were not seriously injured and because the parents did not observe the abuse of their children. The State and its agents' contention is without merit.

*James* does not require a contemporaneous observation of death or serious injury of the victim in order for the bystander to recover, and the evidence in this case is undisputed that the children were sexually abused and that because of that abuse they have been permanently scarred in a psychological sense.

The State and its agents' contention that the trial court erred in awarding excessive damages is also without merit. A verdict in a civil case will be sustained if the evidence, when viewed and construed most favorably to the prevailing party, is sufficient to support that verdict. *Williams v. Monarch Transp.*, 238 Neb. 354, 470 N.W.2d 751 (1991). Plaintiffs' expert witness testified that all the plaintiffs had sustained permanent damage and would need psychiatric treatment for 3 to 5 years after the trial of the case, in November 1990. Dr. Klaus Hartmann, the chief of the adolescent program at the Lincoln Regional Center, testified for the State and its agents. Dr. Hartmann testified that the parents and all of the children had sustained some mental "disorder" or had been psychologically affected as a result of the foster child's actions. Dr. Hartmann had the opinion that all of the children had been traumatically abused and that at the time of the trial, they still exhibited effects of the trauma. He also was of the opinion that as of the time of trial, all the members of the family needed at least 4 to 6 months of therapy.

The evidence in this case supports the trial court's award of damages. To contend to the contrary is an attempt to further minimize the flagrant damages that the State and its agents allowed to be inflicted on the plaintiffs.

AFFIRMED.

CAPORALE, J., concurring in part, and in part dissenting.

I concur in the judgments in favor of the children, but must dissent with respect to the judgments in favor of the parents. I do so on two grounds.

First, although the State and its agents' indifference and negligence in this case are unfathomable, the parents were nonetheless themselves guilty of contributory negligence sufficient to bar their recovery as a matter of law. For the parents to have permitted the foster child to care for their children for any period of time, no matter how brief or under what circumstances, within a few weeks after they learned he had sexually assaulted one of their children is as inexplicable as the conduct of the State and its agents.

Second, the majority erroneously and dangerously extends the ill-advised bystander recovery rule adopted in *James v. Lieb*, 221 Neb. 47, 375 N.W.2d 109 (1985). *James* held only that one alleging that he helplessly watched his sister get hit, run over, and killed by a negligently operated truck, as the result of which he became physically ill and suffered, and would continue to suffer, mental anguish and emotional distress, had stated a cause of action in tort, notwithstanding that he had not alleged that he himself had been within the zone of danger.

In so holding, the *James* majority recognized that such bystander recovery depended upon a defendant's adjudicated liability and fault for the injury or death of the victim because without such fault, there would be no foundation for the tort-feasor's duty of care to third parties, a duty depending upon the foreseeability of the risk. However, ignoring the rule that the language of a judicial opinion must be read in the context of the facts under consideration and its meaning limited by those facts, *Abbott v. Gould, Inc.*, 232 Neb. 907, 443 N.W.2d 591 (1989), the *James* majority went on to muse about a number of things ancillary to its holding.

It anticipated that there would be no need for a physical

injury to the plaintiff. It also ruminated about the kind of connection which would be required between the plaintiff and the victim and speculated that the connection was to be measured not by a certain degree of consanguinity but, rather, by whether there existed a marital or some other undefined intimate familial relationship. With scant focus on the requisite nature of the plaintiff's reaction to the victim's hurt, the *James* majority nonetheless pondered the type of hurt which would bring the bystander rule into play and foreshadowed the need for either death or serious injury of an unspecified character. It also acknowledged that how the victim's hurt entered into the consciousness of the plaintiff would be a factor in determining whether the rule applied, but blissfully avoided further meditation on the subject except to quote with approval from *Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 518, 413 N.E.2d 690, 697 (1980):

> A plaintiff who rushes onto the accident scene and finds a loved one injured has no greater entitlement to compensation for that shock than a plaintiff who rushes instead to the hospital. So long as the shock follows closely on the heels of the accident, the two types of injury are equally foreseeable.

It is clear that if the bystander rule is to be applied to any familial relationship, it cannot be argued that it should not be applied between a parent and his or her minor children living in the parent's household. However, even assuming that no physical injury is required and that, in this case, the parents' emotional distress was "so severe that no reasonable person could be expected to endure" it, *Dale v. Thomas Funeral Home*, 237 Neb. 528, 532, 466 N.W.2d 805, 808 (1991) (involving the intentional infliction of emotional distress), and further assuming that the harm to the children constitutes a sufficiently severe injury, the bystander recovery rule still does not apply. This is so because the children's hurt did not enter into the parents' consciousness with the sudden and traumatic impact the rule requires.

The court in *Schurk v. Christensen*, 80 Wash. 2d 652, 497 P.2d 937 (1972), denied recovery for the negligent infliction of mental anguish and distress to the parents of a 5-year-old girl,

one of whom was told that the girl had been sexually assaulted several times during the preceding 4 or 5 months by the defendants' 15-year-old son, who served as the girl's babysitter. However, the Supreme Court permitted the cause to proceed against the babysitter on the theory he intentionally inflicted emotional distress upon the girl's parents. In so ruling, the *Schurk* court reasoned that as to the negligent infliction of mental anguish and distress claim, the parents had not met the requirement that their shock resulted from a direct emotional impact upon them from the sensory and contemporaneous perception of the assaults.

For further examples of the application of the requirement that there be a contemporaneous sensory perception of the victim's hurt, see, e.g., *Mazzagatti v. Everingham by Everingham*, 512 Pa. 266, 516 A.2d 672 (1986) (recovery denied where parent, approximately a mile away, arrived at accident scene after child's injury resulting in death); *Nutter v. Frisbie Mem. Hosp.*, 124 N.H. 791, 474 A.2d 584 (1984) (recovery denied where parents claiming child died as result of emergency room malpractice arrived after child's death); *Caparco v. Lambert*, 121 R.I. 710, 402 A.2d 1180 (1979) (recovery denied to parent who did not witness accident in which child injured); *Shelton v. Russell Pipe & Foundry Co.*, 570 S.W.2d 861 (Tenn. 1978) (recovery denied to parents who neither visually nor aurally witnessed accident in which child injured, but learned of it through reports of third parties considerable time afterward); *Baas v. Hoye*, 766 F.2d 1190 (8th Cir. 1985) (applying Iowa law, denied recovery to parent who did not see child ingest improperly bottled medication); *Bloom v. Dubois Regional Medical Ctr.*, ___ Pa. Super. ___, 597 A.2d 671 (1991) (husband who found wife hanging in hospital failed to state a cause of action for negligent infliction of emotional distress, as he had not observed traumatic infliction of injury); *McKethean v. WMATA*, 588 A.2d 708 (D.C. 1991) (denied recovery to plaintiff who was block away when automobile struck his daughter, granddaughter, and friends); *Fife v. Astenius*, 232 Cal. App. 3d 1090, 284 Cal. Rptr. 16 (1991) (denied recovery to automobile accident victim's parents and brothers who, even if were considered to be at scene by

virtue of rushing to street within seconds of hearing impact, did not know at time accident occurred that victim was being injured); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988) (recovery denied to stepparent who arrived at scene after stepchildren injured and neither saw nor otherwise contemporaneously perceived accident); *Crenshaw v. Sarasota County Public Hosp. Bd.*, 466 So. 2d 427 (Fla. App. 1985) (recovery denied to parent of stillborn child who did not see body which was mutilated after it was inadvertently placed with hospital laundry); and *Perlmutter v Whitney*, 60 Mich. App. 268, 230 N.W.2d 390 (1975) (recovery denied to parents who neither saw nor were near scene of accident where child was injured).

The parents here neither saw nor heard any assault taking place; rather, they acquired their after-the-fact knowledge of the occurrences through the reports of third persons, and their distress was so slow in developing that they permitted the foster child to provide care for all their children over a period of weeks. Under these circumstances, it cannot reasonably be said that they suffered their distress as the result of a direct emotional impact from the sensory and contemporaneous perception of the assaults.

I fear the majority opinion in this case is but another illustration of the observation that hard cases make bad law. *Northern Securities Co. v. United States*, 193 U.S. 197, 24 S. Ct. 436, 48 L. Ed. 679 (1904) (Holmes, J., dissenting).

HASTINGS, C.J., and BOSLAUGH, J., join in this concurrence and dissent.