PRIME INC., APPELLANT AND CROSS-APPELLEE, V. YOUNGLOVE
CONSTRUCTION COMPANY AND ROBERT WARREN DECKER,
APPELLEES AND CROSS-APPELLANTS.

418 N.W.2d 539

Filed January 22, 1988.    No. 86-024.

Eugene P. Welch and Lynn A. Mitchell of Gross, Welch,
Vinardi, Kauffman & Day, P.C., for appellant.

P. Shawn McCann and Edward Noethe of Sodoro, Daly & Sodoro, for appellees.

BOSLAUGH, WHITE, CAPORALE, and SHANAHAN, JJ., and BRODKEY, J., Retired, and COLWELL, D.J., Retired.

SHANAHAN, J.

Prime Inc. filed its negligence action in the district court for Douglas County and sought a judgment against Younglove Construction Company and Robert Warren Decker for property damage on account of a motor vehicle collision. Decker counterclaimed for his personal injury sustained in the collision. Younglove counterclaimed for its property damage and for Prime's contribution on account of Younglove's settlement of a personal injury claim by the patrolman who was injured in the collision which is the subject of the proceedings under review. The jury returned a general verdict for Younglove and Decker regarding Prime's claim and returned a general verdict for Prime on the counterclaims. We reverse and remand for a new trial.

## PRIME'S SEMI AND THE COLLISION

Joe Butchko and Carl Wallace, Prime employees, were the drivers for Prime's semi headed east on Interstate 80 out of North Platte on the morning of January 22, 1982. Snow fell constantly as Wallace drove the semi at 50 to 55 miles per hour toward Kearney. Approximately 50 miles west of Kearney, Prime's semi encountered a snowpacked Interstate, blowing snow, and ice beginning to form on the highway. The visibility had deteriorated to less than a quarter of a mile and was diminishing. Wallace, at the time, did not realize that Prime's semi was passing the Kearney interchange on the Interstate. As he was continuing eastward, shortly after 1 p.m., Wallace dropped the tractor into fourth or fifth gear, the "low side" of the tractor's 10 gears, so that the rig was moving at 20 miles per hour in "[n]ear blizzard conditions" and "poor visibility" 5 miles beyond Kearney. I-80 consisted of four lanes for traffic, that is, a grass median separated the Interstate's two westbound lanes from its two eastbound lanes. While Wallace was driving the semi in the right, or south, lane of eastbound I-80, the rig "jackknifed" on the ice- and snow-covered highway, causing

the semi to move to its left and into the median, where the semi "hit something" and bounced back onto eastbound I-80. The semi slid across the Interstate's eastbound lanes and south shoulder, struck a guardrail adjacent to the highway's shoulder, and finally, in a jackknifed position, came to rest with its tractor headed somewhat northeasterly. The tractor's rear duals were against the guardrail. Wallace and Butchko got out of the tractor to examine the damage. The highway's guardrail was damaged, and the tractor's fuel tank was punctured, allowing diesel fuel to escape onto the highway. Prime's stationary unit was blocking the right lane and partially protruded into the eastbound Interstate's left, or north, lane.

Butchko and Wallace returned to their tractor, where Wallace engaged the tractor's two axles for additional traction, rather than the one axle utilized in normal over-the-road movement of a semi. The semi moved slowly but, as the rig began to jackknife again, Wallace was unable to steer the tractor, which was then moving into the north, or "passing," lane of eastbound I-80. At that location on the Interstate, there was a slight incline ascending toward an overpass east of Prime's semi. Wallace was unaware of the incline and, having straightened the semi in the north lane, continued an attempt to move the unit eastward. After 2 or 3 minutes in such maneuver, Wallace realized "we weren't going to go any farther, so we left it there" in the left, or passing, lane of I-80.

Prime's unit did not have a citizens band radio, but Prime's drivers went to another truck, which had stopped behind the Prime unit against the south guardrail and had a radio which was used to send a call for help. Wallace and Butchko returned to the cab of their unit, where they waited for help to arrive. Prime's unit was not equipped with sand, chains, or flares, but did carry some small plastic reflectors for placement on the road. Wallace and Butchko decided not to use the reflectors, which they believed would blow away in the snowstorm's strong wind. While Wallace and Butchko were waiting for the summoned help, the unit's trailer lights and emergency flashing lights were operating. Although cars passed on the south side of the stationary Prime unit, Butchko and Wallace took no steps to warn motorists about the situation involving Prime's semi.

After 10 or 15 minutes, a cruiser of the Nebraska State Patrol arrived and stopped, according to Wallace, approximately four car lengths, or 32 feet, directly behind Prime's trailer in the north lane.

Trooper Thomas E. Nesbitt of the Nebraska State Patrol had responded to the call for help regarding Prime's semi. When he arrived, Trooper Nesbitt found Prime's unit in a "blizzard" and blocking all the north lane and about one-half of the south lane of eastbound I-80, although there was approximately 14 feet of "passable driving surface" on the south side of the stationary semi. According to Trooper Nesbitt, he stopped and stationed his cruiser at a point in the north lane 25 yards immediately behind Prime's trailer. Trooper Nesbitt activated the cruiser's "emergency flashing equipment," which included the standard emergency flashing lights and a "Visibar, which has alternating flashing lights and rotating lights on it," and then proceeded to contact Wallace and Butchko, whom he met midway between the trailer and the cruiser. Wallace told Trooper Nesbitt that the Prime unit "couldn't make the incline." Because state property, namely, the guardrail, had been damaged, Trooper Nesbitt told Wallace and Butchko that an accident report would have to be filled out, and suggested they return to the cruiser to complete that report. While the three were inside the cruiser, and as Trooper Nesbitt was replacing his radio's microphone after a call for a wrecker, the trooper glanced into the cruiser's rearview mirror and saw Younglove's eastbound semi as it went into a "jackknife" in the passing lane, or, in the trooper's words, "I observed a semi tractor-trailer that was going to run into my—the rear of my vehicle, that it was starting to jackknife and then run into me." The impact from the collision spun the cruiser around "maybe three times" and forced the cruiser into the south railing on the overpass. After colliding with the cruiser, Younglove's semi then struck the right rear of Prime's trailer and propelled that semi to a position alongside the cruiser at the overpass. The weather conditions described by Trooper Nesbitt and Wallace prevailed until photographs were taken by the Nebraska State Patrol shortly after the collision. Those photographs substantiate the storm conditions recounted by Wallace and the trooper.

## YOUNGLOVE'S SEMI

Younglove's semi, loaded with construction equipment and steel, was driven by Decker and was traveling east on I-80. Approximately 5 miles west of the eventual collision site, Decker passed a truck driven by Dale Clausen, who unsuccessfully attempted to contact Decker by radio. However, Decker's CB was not in operation, because Decker was listening to a Freddie Fender tape on Decker's stereo. According to Decker, weather conditions consisted of intermittent snow, and visibility on I-80 was 1,000 feet to a quarter of a mile. As Decker passed by Kearney, the weather changed, with increased snow, although such change in weather never resulted in a blizzard. On account of the change in weather, Decker reduced the speed of his semi to 35 miles per hour as he approached the prospective collision site. Under the prevailing conditions, Decker asserted, he could stop his semi, traveling at a speed of 35 miles per hour, within a distance of 100 feet. When Decker observed a condition which he described as the wind "swirling . . . a lot of snow off the ground . . . it was just all white" ahead, at an unknown distance from the point of such observation, Decker let up on the tractor's accelerator but did not "gear down" or apply brakes on his unit, because cars were closely following him and likely would have run into the rear of his rig if it suddenly decelerated. Decker was unable to state the height reached by the swirling snow or the distance his semi traveled in that snowy condition, but, while the rig was "engulfed" in the swirling snow, the speed of Decker's semi decreased to 25 miles per hour. When his semi came out on the east side of the swirling snow, Decker saw Prime's unpainted aluminum trailer, "this big silver thing blocking" both lanes, 125 feet ahead of Decker. Because he believed there was insufficient room to pass Prime's semi on its right side, Decker "cut to the left" on the packed snow covering the Interstate, causing his semi to jackknife and collide with the rear of the patrol cruiser, and then strike the right rear of Prime's trailer. Decker's semi came to rest at the guardrail on the south edge of the median. Before entering the swirling snow, Decker never saw Prime's semi or the patrol cruiser. On leaving the swirling snow, Decker did not see the parked cruiser, with its flashing and rotating lights.

At the scene shortly after the collision, Decker encountered Wallace, whom he asked "what in the hell he'd [Decker] hit." Clausen, the trucker who had attempted to contact Decker by CB, arrived at the scene and observed the damaged cruiser, with its rotating lights still in operation. Clausen described road conditions from Kearney east to the collision as "slick," with snow and ice on the road's surface. According to Clausen, when Decker passed him approximately 5 miles west of the collision scene, visibility was 100 feet or less, a condition which persisted during Clausen's approach to the collision site.

Trooper Nesbitt was injured in the collision, and later settled his personal injury claim against Younglove and Decker for $25,000.

## PLEADINGS

In its petition, as specifications of negligence by Younglove and Decker, Prime alleged Decker's failure to keep a proper lookout, reasonably control Younglove's semi, heed the warning signals from Trooper Nesbitt's cruiser, and stop within Decker's range of vision. Prime also alleged that Decker drove at an unreasonable speed under the circumstances.

Among the specifications of Prime's contributory negligence alleged in their answer, Younglove and Decker asserted that Prime had negligently failed to warn motorists about the semi's obstruction of I-80 or use flares, reflectors, and fusees to warn approaching motorists. Additionally, the answer contained allegations that Prime failed to inspect and maintain its semi and allowed its tractor to be driven without chains and without safety equipment to warn motorists.

## PRIME'S MOTION FOR A DIRECTED VERDICT

At the conclusion of all the evidence, Prime moved for a directed verdict that it was not negligent and that the negligence of Younglove and Decker caused the collision, so that only the question of damages was submissible to the jury. Alternatively, Prime moved for a directed verdict that Younglove and Decker were negligent as a matter of law, so that the questions for the jury would be whether Prime was contributorily negligent and the effect of any contributory negligence in view of comparative negligence of the parties. See Neb. Rev. Stat. § 25-21,185 (Reissue 1985).

The court overruled Prime's motions and submitted the case to the jury on all questions concerning negligence of the parties. By its general verdict, the jury found in favor of Younglove and Decker on Prime's claim and against Younglove and Decker on their counterclaims. Later, apparently as a matter of law in view of the verdicts, the district court determined that Prime was not obligated to contribute concerning Trooper Nesbitt's personal injury claim and settlement with Younglove and Decker. Prime appeals, and Younglove and Decker cross-appeal.

ASSIGNMENTS OF ERROR

Prime contends that the district court erred in (1) not directing a verdict that Younglove and Decker were negligent as a matter of law and submitting the question of the defendants' negligence for the jury's determination and (2) not directing a verdict in favor of Prime on the issue of liability and thereby rendering the question of damages as the only matter for the jury's determination.

In their cross-appeal, Decker and Younglove's only assignment of error is directed to their claim for contribution from Prime regarding Trooper Nesbitt's personal injury, namely, the district court's judgment that Prime is not obligated to contribute as a joint tort-feasor concerning Nesbitt's claim and settlement.

NEGLIGENCE; DIRECTED VERDICT OR JURY QUESTION

" 'To determine whether conduct constitutes negligence, the invariable standard is reasonable care, although reasonable care is directly proportional to the danger inherent in conduct and may vary depending on the circumstances.' " *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 452, 412 N.W.2d 56, 75 (1987) (quoting from *Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 403 N.W.2d 335 (1987)). " 'The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it.' " *Saporta v. State*, 220 Neb. 142, 149, 368 N.W.2d 783, 787 (1985) (quoting from Prosser and Keeton on the Law of Torts, *Proximate Cause* § 41 (5th ed. 1984)).

A court should not decide an issue as a matter of law

unless the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom. [Citation omitted.] Thus, in a jury trial, when evidence compels but one reasonable conclusion regarding an issue or question in the litigation, a court may properly direct a verdict on such issue or question.

*Rahmig v. Mosley Machinery Co., supra* at 449, 412 N.W.2d at 74.

## RANGE OF VISION RULE AND CONTROL

Generally, it is negligence as a matter of law if one operates a motor vehicle on a public street or highway and, on account of the manner of operation, is unable to stop such operator's vehicle or turn that vehicle aside without colliding with an object or obstruction on the street or highway within the operator's range of vision. See, *Chlopek v. Schmall*, 224 Neb. 78, 396 N.W.2d 103 (1986); *McCauley v. Briggs*, 218 Neb. 403, 355 N.W.2d 508 (1984); *C. C. Natvig's Sons, Inc. v. Summers*, 198 Neb. 741, 255 N.W.2d 272 (1977); *Vrba v. Kelly*, 198 Neb. 723, 255 N.W.2d 269 (1977); *Roth v. Blomquist*, 117 Neb. 444, 220 N.W. 572 (1928). The "range of vision" rule is applicable, notwithstanding that a motorist's vision is impaired by atmospheric or weather conditions, such as falling or blowing snow, rain, mist, or fog. See, *C. C. Natvig's Sons, Inc. v. Summers, supra; Vrba v. Kelly, supra; Guynan v. Olson*, 178 Neb. 335, 133 N.W.2d 571 (1965).

To avoid application of the range of vision rule, Younglove and Decker argue that Prime's rig was "a white tractor with a silver-colored trailer . . . and therefore was the same or similar color as the roadway and sky on this windy, snowy day . . . ." Brief for Appellees at 5.

An exception to or exoneration from the range of vision rule exists when a motorist, otherwise exercising reasonable care, does not see an object or obstruction sufficiently in advance to avoid colliding with that object or obstruction, which is relatively indiscernible on account of its color similar to the street or highway and thereby is rendered indistinguishable from the surface. See, *Bartosh v. Schlautman*, 181 Neb. 130, 147 N.W.2d 492 (1966); *Guynan v. Olson, supra*. See, also, *McClellen v. Dobberstein*, 189 Neb. 669, 204 N.W.2d 559

(1973) (nighttime collision; unlighted truck covered with tar and dirt; parked in roadway); *Monasmith v. Cosden Oil Co.*, 124 Neb. 327, 246 N.W. 623 (1933) (nighttime collision; unlighted car with color similar to gravel surface; parked on road); *Haight v. Nelson*, 157 Neb. 341, 59 N.W.2d 576 (1953) (mud-spattered and unlighted car stalled in dark on a road with an oil mat surface).

In the present case, Decker admitted that he saw the swirling snow on I-80 at an unspecified distance before he entered that condition on the highway. As expressed in *Newkirk v. Kovanda*, 184 Neb. 127, 131, 165 N.W.2d 576, 579 (1969):

> In Kuffel v. Kuncl, 181 Neb. 770, 150 N.W.2d 908, this court said: "At least where the presence of frost, ice, snow, mist, fog, or smoke [was] known, or should have been reasonably anticipated, they have consistently been held (under our cases) to be conditions rather than intervening or proximate causes in the legal sense."

In *Guerin v. Forburger*, 161 Neb. 824, 835, 74 N.W.2d 870, 877 (1956), this court stated:

> "On principle it would appear that the existence or presence of smoke, snow, fog, mist, blinding headlights or other similar elements which materially impair or wholly destroy visibility are not to be deemed intervening causes but rather as conditions which impose upon the drivers of automobiles the duty to assure the safety of the public by the exercise of a degree of care commensurate with such surrounding circumstances. . . ."

(Quoting from *Fairman v. Cook*, 142 Neb. 893, 8 N.W.2d 315 (1943).) See, also, *Guynan v. Olson, supra* (frost, ice, snow, mist, and fog are conditions requiring drivers to exercise a degree of care commensurate with the circumstances).

In *Hilferty v. Mickels*, 171 Neb. 246, 257-58, 106 N.W.2d 40, 47-48 (1960), this court noted:

> It is the duty of all persons in the operation of an automobile to use due or reasonable care to prevent accident or injury. The user of a highway is required to use reasonable care, considering the existing conditions and circumstances. The driver of a motor vehicle has the duty to keep a proper lookout and watch where he is driving . .

. . He must keep a lookout ahead or in the direction of travel . . . and is bound to take notice of the road, to observe conditions along the highway, and to know what is in front of him for a reasonable distance.

The blowing snow, as a foreseen condition recognized by Decker, required that Decker stop his semi until visibility was restored or reduce the speed of his vehicle and exercise control which would enable Decker to stop his semi immediately if necessary. See *Murray v. Pearson Appliance Store*, 155 Neb. 860, 54 N.W.2d 250 (1952).

Although Decker saw an object in his path, a "big silver thing," when he was 125 feet from that object, Decker was unable to avoid colliding with Prime's semi. Also, while Decker attempts to exonerate himself from the range of vision rule, we cannot overlook the undisputed fact that Trooper Nesbitt's cruiser was stationed somewhere between 32 and 75 feet directly behind Prime's stationary semi. By its rotating and flashing lights, Trooper Nesbitt's visible cruiser warned an approaching motorist about the obstructed highway, if such motorist were maintaining a lookout forward. However, Decker never saw the cruiser before colliding first with the cruiser and then with Prime's unit, which was ahead of the cruiser. Under the circumstances, nothing relieved Decker from the range of vision rule. While Decker acknowledged that he could stop his semi, traveling at 35 miles per hour, within a distance of 100 feet, which was some 25 feet less than the distance between his vehicle and Prime's semi at Decker's first observation of the obstruction ahead, Decker failed to stop his unit, traveling at 25 miles per hour, before the collisions.

Considering all the evidence adduced concerning Younglove's negligence, we find there is but one reasonable conclusion, namely, that Younglove, through Decker, was negligent as a matter of law and that Prime should have been granted a directed verdict on the issue of the defendants' negligence.

Prime contends that there was no submissible issue regarding its negligence under the circumstances. On the basis of the record presented to this court, whether Prime negligently failed to equip its unit with appropriate safety accessories, such as

suitable reflectors or other appropriate warning devices, to alert eastbound I-80 motorists and whether Prime's drivers negligently failed to utilize available safety equipment were matters for the jury to decide. Therefore, the district court correctly denied Prime's motion for a directed verdict on liability.

## CONTRIBUTORY NEGLIGENCE AND COMPARATIVE NEGLIGENCE

Although Younglove was, under the circumstances of this case, guilty of negligence as a matter of law which was a proximate cause of the collision, the amount of damages sustained by Prime was a question to be resolved by the jury. Even though Younglove was guilty of negligence as a matter of law, Prime's claim for damages was subject to the defense of contributory negligence. On submission of the negligence question to the jury and if the jury found Prime guilty of negligence which was slight negligence under the circumstances, § 25-21,185, Nebraska's comparative negligence statute then required the jury to determine whether Younglove's negligence was gross in comparison with Prime's negligence—a factual determination for the jury. See, *Hilferty v. Mickels*, 171 Neb. 246, 106 N.W.2d 40 (1960); *Bezdek v. Patrick*, 170 Neb. 522, 103 N.W.2d 318 (1960).

The district court's failure to grant Prime's motion for a directed verdict on the issue of Younglove's negligence is reversible error. Consequently, we reverse the district court's judgment entered on the verdict against Prime, and we remand this matter to the district court for a new trial.

## YOUNGLOVE'S CROSS-APPEAL

The issue raised by Decker and Younglove's cross-appeal depends on Prime's culpability as a negligent tort-feasor concerning the collision in which Trooper Nesbitt was injured. As a consequence of our disposition of Prime's appeal, namely, a new trial, Prime's negligence regarding the collision is yet to be determined. Without a determination that Prime's conduct was negligence and a proximate cause of the collision which injured Trooper Nesbitt, the issue of contribution from Prime cannot be determined. Therefore, the district court's judgment regarding Prime's liability for contribution on the Nesbitt claim

434

is reversed and remanded for disposition dependent on the new trial ordered on Prime's cause of action.

REVERSED AND REMANDED FOR A NEW TRIAL.

GRANT, J., participating on briefs.