GLADYS STINSON, APPELLEE, V. CITY OF LINCOLN, DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLANT, AND JACK STINSON, THIRD-PARTY DEFENDANT, APPELLEE.

617 N.W.2d 456

Filed September 19, 2000.   No. A-99-1089.

Dana W. Roper, Lincoln City Attorney, and Joel D. Pedersen for appellant.

Gary J. Nedved, of Keating, O'Gara, Davis & Nedved, P.C., for appellee.

HANNON, INBODY, and MOORE, Judges.

MOORE, Judge.

## INTRODUCTION

This case involves a suit for personal injuries sustained by Gladys Stinson when the vehicle she was traveling in collided head on with a snowblower owned by the City of Lincoln, Nebraska (City). The action was tried to the district court without a jury. The district court found in favor of Gladys. The City appeals, assigning various errors which it alleges occurred in the district court.

## BACKGROUND

The morning of March 9, 1998, was a bright and sunny day following a major snowstorm in Lincoln. The wind was blowing, creating "ground blizzards" or "whiteouts," and many of the City's streets were drifted or drifting shut. The City was operating under a declared snow emergency.

Ed Crouse had been an employee of the City for approximately 20 years. He had 6 or 7 years' experience in the operation of snow blowing equipment. Crouse had been sent to Pine Lake Road with a snowblower with instructions to clear that road. Snowplows had attempted to clear Pine Lake Road earlier in the day, but were unsuccessful because of the heavy wind and snow. The snowblower is a large front-end loader tractor with a large front-end blowing device that is attached when needed to blow snow. Pine Lake Road is a four-lane arterial road that runs east and west. The Lincoln Police Department had reported to the City that the road had drifted shut.

Crouse testified that upon his arrival at Pine Lake Road, he observed that one part of the road was drifted shut except for one eastbound lane. Although not entirely clear from the testimony, it appears that westbound traffic at that point in the road would cross the center island and travel against the eastbound traffic for a short distance and then cross back over. This

allowed the westbound traffic to continue to move. Upon arrival, Crouse began operating the snowblower in the westbound lanes in a westbound direction and made two passes in this manner. Because the snowblower was plugging up as he operated it and because the visibility was poor, Crouse decided to blow snow from the other side of the drift, which placed him eastbound in a westbound lane, against the traffic. Crouse testified that he was not aware of any ordinance or policy that allowed snow removal equipment to operate against traffic, that no one had ever said anything to him about it, and that he made the decision to do so on his own. Crouse testified that he knew he was creating a dangerous situation by operating against the traffic and more than once had stopped the equipment he was operating in order to allow traffic to pass. Crouse also testified that he had never blown open drifts before and that normally the snowblower is used in the downtown and business areas.

Crouse traveled approximately 30 or 40 feet against the traffic when he felt a "jolt." The blowing snow from his operation of the blower had completely obscured his vision of oncoming cars, and he knew that it obscured the vision of the oncoming cars and that the visibility was zero when he was blowing the snow. The jolt he felt turned out to be the vehicle that Gladys was a passenger in and which was driven by her husband, Jack Stinson, proceeding westbound on Pine Lake Road. Crouse testified that he never saw the Stinson vehicle before impact and that the accident happened on his second pass against the traffic. He had been in the area for about one-half hour prior to the accident. Crouse testified that this was the first time he had operated against the traffic in these types of conditions.

Crouse testified that the snowblower is a very big tractor, that the whiteout at the time of the accident was caused by the snowblower itself, and that his visibility was zero. He estimated that he would have been traveling at 3 or 4 m.p.h. at the time of the accident. The snowblower had a strobe light on the top, four-way flashers "about halfway in the machine," two sets of headlights in front, and a set of headlights in the back. Crouse testified that he had the lights operating on the day of the accident. He told the investigating officer that he was going against the traffic so he could see better.

Gladys and Jack testified at the trial. They were between 60 and 70 years old at the time of the accident. They had been in the hardware store business for approximately 34 years and owned a hardware store in Lincoln, where they both worked. At the time of the storm and accident, they lived one block north of Pine Lake Road and were able to see Pine Lake Road from the window of their home. They could clearly see the traffic on Pine Lake Road on the day of the accident without any visibility limitation; however, because of the heavy snow, they delayed going to the store that morning. The Stinsons observed vehicles traveling in both directions on Pine Lake Road and at approximately 10:15 a.m., they left together for the store in a company-owned pickup. Jack was driving, and he turned from 39th Street onto the westbound lane on Pine Lake Road.

Gladys testified that the accident occurred between 29th and 32d Streets. Before the accident, they were having no problem getting through the snow, and she told the investigating officer that their speed was between 20 and 30 m.p.h. As they approached the crest of a hill, they were beginning to experience a whiteout or ground blizzard condition, which she testified that she had experienced many times in driving roads in Nebraska and that she had simply driven through those conditions. She believed that the location of the whiteout was between 34th and 32d Streets. The collision occurred as they entered the whiteout. They had no indication that anything would be inside the whiteout and never saw the snowblower or vehicle lights. Gladys and Jack both suffered personal injuries in the accident. Gladys testified that after the accident, she remembered observing that there were no lights on the snowblower and that the "first thing I said" to the officer on the scene was that there were no lights or indicators on the snowblower. Gladys indicated that because their vehicle had been garaged, there was no ice or snow to obscure the windshield before impact. She estimated that Jack had reduced his speed about 5 m.p.h. approximately 150 feet before the impact and that the whiteout covered the whole width of the road on their side of the median.

Jack testified that he was driving 20 to 30 m.p.h. before the accident and dropped his speed as they approached the whiteout. He had experienced many whiteouts, at least "50 or 60," in his

years of driving in Nebraska and elsewhere and always would slow down and continue through them. This seemed like an ordinary whiteout, and there was no indication that anything was inside the whiteout. At the hospital immediately after the accident, Jack told an officer that he had been driving 2 to 3 m.p.h., but he does not recall making that statement and at trial denied that his speed would have been that slow. He testified that he had lived near Pine Lake Road for about 2 years and had never seen the road in the conditions of March 9, 1998. Jack testified that he slowed down upon reaching the whiteout, probably by taking his foot off the accelerator rather than applying the brakes. He thought this was just a natural whiteout caused by winds; however, there was zero visibility in the whiteout. Jack described the road condition as snow packed, but in good shape. An accident reconstruction expert concluded that the speed of the Stinson vehicle at the point of impact was 23 to 25 m.p.h., and Jack testified that he would agree with that estimate.

The testimony of Jack More, a supervisor with the City since 1989 and an employee of the City for 31 years, was that Crouse was a very competent operator of the equipment and that when the snowblower is in operation, it is only able to travel at 1 to 3 m.p.h. More testified that operating the snowblower against traffic does not violate the policy of the City and that the City policy allows the operator to assess the risk of operating against traffic. On cross-examination, More testified that there was no written procedure, manual, guideline, or other source which stated that operating against traffic is authorized. On redirect examination, More acknowledged that City ordinance authorizes snow removal equipment to operate against traffic. He also testified that one of the major reasons that operating against traffic is done is to save time, that operating against traffic to save time should never be done if it compromises the safety of the traveling public, and that it would be a safe practice to operate against traffic only if the operator is able to see oncoming traffic. More testified that it is important to open the streets for emergency vehicles and that it is up to the individual operator to decide if he or she should operate against traffic in order to open the street. More testified that after the accident, he went to the scene and observed that all of the lights on the snowblower were on and operating.

The investigating officer testified that as he approached the scene of the accident, it was difficult to see because of blowing snow. At the scene of the accident, Crouse's statements to the officer were consistent with what he testified to at trial. When he arrived at the scene, the officer did not remember seeing any of the snowblower's lights operating. When asked at trial, the officer stated that it was his opinion that 20 to 30 m.p.h. was a reasonable speed on Pine Lake Road that day.

When the investigating officer was called during the City's case in chief, he testified that it would not be a reasonable speed to enter a whiteout condition at 20 to 30 m.p.h. On cross-examination, he testified that he had experienced many whiteout situations and that he sometimes stops for them and sometimes not, but does slow down for them.

Following a bench trial, the district court entered a judgment for Gladys and against the City in the amount of $75,000, reduced by 15 percent contributory negligence attributed to Jack, for a total award of $63,750.

## ASSIGNMENTS OF ERROR

On appeal, the City's assigned errors are that the trial court erred in determining that the City's activities were not within the meaning of the Emergency Management Act, Neb. Rev. Stat. § 81-829.36 et seq. (Reissue 1996 & Cum. Supp. 1999), and in determining that the City's activities were not exempt from the waiver of immunity under the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. § 13-901 et seq. (Reissue 1997).

The City's remaining assigned errors, rephrased and consolidated, are that the trial court erred in failing to direct a verdict that Jack's actions were the sole proximate cause of the accident and in finding that the proximate cause of the accident was the negligence of the City.

## STANDARD OF REVIEW

In actions brought pursuant to the Political Subdivisions Tort Claims Act, the findings of the trial court will not be disturbed on appeal unless they are clearly wrong, and when determining the sufficiency of the evidence to sustain the judgment, it must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in favor of

such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence. *McIntosh v. Omaha Public Schools*, 254 Neb. 641, 578 N.W.2d 431 (1998).

■ The performance or nonperformance of a discretionary function cannot be the basis of liability under the Political Subdivisions Tort Claims Act. *Lemke v. Metropolitan Utilities Dist.*, 243 Neb. 633, 502 N.W.2d 80 (1993). Whether the undisputed facts demonstrate that liability is precluded by the discretionary function exemption of the Political Subdivisions Tort Claims Act is a question of law. *Id.* Regarding a question of law, an appellate court has an obligation to reach a correct conclusion independent of that reached by the court below. *Lemke, supra.*

■ Proximate cause is a question of fact to be determined by the trial court as fact finder, and will not be disturbed on appeal unless clearly wrong. *Eledge v. Farmers Mut. Home Ins.*, 6 Neb. App. 140, 571 N.W.2d 105 (1997). In order to reverse a trial court's decision, an appellate court must find as a matter of law that the trial court's findings are clearly wrong. *Howell v. Douglas Cty.*, 8 Neb. App. 572, 597 N.W.2d 636 (1999). "In other words, we must find that there is no sufficient factual basis to support the trial court's findings." *Id.* at 578, 597 N.W.2d at 640.

## ANALYSIS

*Immunity Under Emergency Management Act.*

The City asserts that it is immune from liability or suit under the Emergency Management Act (Act). The City demurred to Stinson's amended petition on this ground, which demurrer was overruled by the district court, and the matter proceeded to trial. In its findings and order at the conclusion of the trial, the district court again addressed the question of the application of the Act and determined that the facts of the case at bar did not fall within the meaning of the Act. The district court's written findings concluded that based upon a reading of the entire statutory scheme of the Act, an 8- to 10-inch winter snowfall is not the type of disaster or civil defense emergency contemplated under the Act; that such a snowfall "does not involve 'widespread or severe damage, injury, or loss of life or property.' See Section 81-829.39"; and that a " 'snow emergency' " is not a disaster under the civil defense statutes.

In *Lawry v. County of Sarpy,* 254 Neb. 193, 575 N.W.2d 605 (1998), upon which the City relies in support of this assigned error, the Nebraska Supreme Court addressed the pleading and procedural requirements of the Act. In *Lawry,* there appeared to be no question that the flooding situation in that case was subject to the provisions of the Act, prior to its amendment in 1996, thereby requiring the plaintiff to plead facts sufficient to render the immunity inapplicable. The Nebraska Civil Defense Act in effect at the time of the events in *Lawry* by its very terms specifically covered flooding. The postamendment Act eliminated the reference to flooding, instead using more generalized language, to-wit, events arising from "any natural or manmade cause." § 81-829.39(2).

The initial question in the instant case with respect to the first assignment of error is whether the Act applies to the actions of the City at issue. If the Act does not apply, the City's assigned error is without merit. Therefore, we proceed to determine the applicability of the Act to the instant case.

The mayor of the City, by executive order No. 054487, declared a snow emergency, quoted herein as follows:

> BY VIRTUE OF THE AUTHORITY VESTED IN ME by the Charter of the City of Lincoln and the provisions of Chapter 10.40 of the Lincoln Municipal Code:
>
> I am hereby declaring a snow emergency on all snow routes, arterial streets and bus routes to take effect at 8:00 AM on March 8th, 1998, after which time any motor vehicle which is parked, stalled, or stuck on a designated snow route, arterial street or bus route shall be subject to removal by the Police Department at the expense of the owner and said owner shall further be subject to the penalty for violation of Sections . . . of the Lincoln Municipal Code.

The City argues that the snow emergency qualifies as an emergency under the Act, defined as follows:

> (3) Emergency means any event or the imminent threat thereof causing serious damage, injury, or loss of life or property resulting from any natural or manmade cause which, in the determination of the Governor or the principal executive officer of a local government, requires immediate action to accomplish the purposes of the Emergency

Management Act and to effectively respond to the event or threat of the event.

§ 81-829.39. If the snow emergency was within the meaning of the Act, the City is immune from liability under the Act by virtue of § 81-829.55, which reads, in pertinent part:

(1) All functions provided for in the Emergency Management Act and all other activities relating to emergency management are hereby declared to be governmental functions. The United States, the state, any political subdivision thereof, any other agencies of the United States, the state, or a political subdivision thereof, and, except in cases of willful misconduct, gross negligence, or bad faith, any emergency management worker complying with or reasonably attempting to comply with the provisions of the act, any emergency management act of Congress, or any order, rule, or regulation promulgated pursuant to the act or any emergency management act of Congress or acting pursuant to any ordinance relating to black-out or other precautionary measures enacted by any political subdivision of the state shall not be liable for the death of or injury to persons or for damage to property as a result of any such activity.

We find that the snow emergency declaration, the purpose of which was to notify citizens about snow removal activities and the need to refrain from parking on designated routes, does not rise to the level of an emergency under the Act. Further, the executive order itself does not reference the Act, rather, only the Lincoln Municipal Code. Finally, there is no evidence that the executive order was filed promptly with the clerk of the City and the Nebraska Emergency Management Agency as required by § 81-829.50, which provides, in pertinent part:

(1) A local emergency may be declared only by the principal executive officer of a local government who finds that conditions defined as a disaster or an emergency exist . . . . *Any order or proclamation declaring, continuing, or terminating a local emergency shall be given prompt and general publicity and shall be filed promptly with the clerk of the local government and the Nebraska Emergency Management Agency.*

(Emphasis supplied.) For the foregoing reasons, we find that the Act does not apply, rendering this assignment of error without merit.

*Immunity Under Political Subdivisions Tort Claims Act.*

The City next asserts that the district court erred in finding that the City's activities were not exempt from the waiver of immunity under the Political Subdivisions Tort Claims Act. The Act eliminates, in part, the traditional immunity of subdivisions for the negligent acts of their employees. *Talbot v. Douglas County*, 249 Neb. 620, 544 N.W.2d 839 (1996). However, § 13-910 provides for limited circumstances in which said immunity is retained.

The City argues on appeal, as it did in the district court, that § 13-910(2) and (10) applies to this case and that thus, the City should retain immunity from suit. Section 13-910 provides:

> (2) Any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of the political subdivision or an employee of the political subdivision, whether or not the discretion is abused;
>
> . . . .
>
> (10) Any claim arising out of snow or ice conditions or other temporary conditions caused by nature on any highway as defined in section 60-624, bridge, public thoroughfare, or other public place due to weather conditions. Nothing in this subdivision shall be construed to limit a political subdivision's liability for any claim arising out of the operation of a motor vehicle by an employee of the political subdivision while acting within the course and scope of his or her employment by the political subdivision.

With respect to § 13-910(2), the matter rises or falls on whether the activities in question were the exercise of a discretionary function. The discretionary function exemption in tort claims extends only to basic policy decisions and not to the exercise of discretionary acts at an operational level. *Talbot, supra.* In *Hamilton v. City of Omaha*, 243 Neb. 253, 498 N.W.2d 555 (1993), the plaintiff sued the city of Omaha and a police

officer. The plaintiff alleged that the officer was negligent because he had assured her that he would protect her from domestic abuse or assault but that the officer failed to do so. One issue on appeal was the application of the discretionary acts exemption of § 13-910(2). The Nebraska Supreme Court held that the provisions of § 13-910 would not exempt the officer or the city, as his employer, from liability. The court cited with approval *Chambers-Castanes v. King County*, 100 Wash. 2d 275, 669 P.2d 451 (1983), in which the plaintiffs alleged that a county sheriff was liable for failure to respond in a timely manner to their call for assistance. In *Chambers-Castanes*, the Supreme Court of Washington observed:

> A simple decision whether to dispatch an officer to the scene of a crime or to investigate a crime, without more, does not involve a basic policy decision by a high level executive which would render the decision maker immune from suit. Rather, the decision is more properly characterized as operational, for it involves a type of discretion exercised at an everyday operational level.

100 Wash. 2d at 282, 669 P.2d at 456.

We also find *Lemke v. Metropolitan Utilities Dist.*, 243 Neb. 633, 502 N.W.2d 80 (1993), helpful to our analysis. When (1) a governmental entity has actual or constructive notice of a dangerous condition or hazard caused by or under the control of the governmental entity and (2) the dangerous condition or hazard is not readily apparent to persons who are likely to be injured by the dangerous condition or hazard, the governmental entity has a nondiscretionary duty to warn of the danger or take other protective measures that may prevent injury as the result of the dangerous condition or hazard. *Id.* "In such a situation, a governmental entity's failure to warn or take other protective measures is not a planning-level decision involving a social, economic, or political policy judgment and, therefore, does not come within the discretionary function exemption of the Political Subdivisions Tort Claims Act." *Id.* at 647, 502 N.W.2d at 89.

We find that the decision by Crouse as to what manner to operate the snowblower was the type of discretion exercised at an everyday operational level such that the discretionary func-

tion exemption does not apply. We find further that the City had actual or constructive notice of a dangerous condition or hazard caused by or under its control and that said condition or hazard was not readily apparent to persons likely to be injured by it such that the City had a nondiscretionary duty to warn of the danger or take preventive measures. We hold that the City is not immune from suit under § 13-910(2).

With respect to § 13-910(10), we find *Woollen v. State*, 256 Neb. 865, 593 N.W.2d 729 (1999), to be controlling. In *Woollen*, an individual suffered personal injury after losing control of his vehicle on a state highway during a steadily falling rain. The injured party sued the State of Nebraska and, after a trial, was awarded damages. The State appealed, alleging that it was immune from suit under the State Tort Claims Act because the evidence showed that the accident was caused by " 'temporary conditions caused by nature . . . due to weather conditions.' " *Woollen*, 256 Neb. at 876, 593 N.W.2d at 738. See Neb. Rev. Stat. § 81-8,219(10) (Cum. Supp. 1992). Section 81-8,219(10) is nearly identical to § 13-910(10), and we adopt the court's interpretation in *Woollen* as applicable to the instant case. In *Woollen*, the court wrote: "The State raised the immunity issue as an affirmative defense to Woollen's petition. As such, the burden of proving it rested upon the State." 256 Neb. at 877, 593 N.W.2d at 738. "Thus, the immunity issue must be evaluated on appeal in light of the proof introduced at trial." *Id.* The evidence in *Woollen*, as found by the trial court and accepted as true on appeal, was that the road surface at the accident scene was marred by ruts in the road, that the State had actual knowledge of the rutted condition and the occurrence of prior accidents, and that the State knew the ruts created an unacceptable risk or danger that violated the State's own safety standards. The State did not repair the ruts, post a warning, or use other means to alert motorists of the danger caused by the ruts. The trial court determined that because of the ruts at the location, rainwater pooled at the base of a slight slope in the road instead of draining off the road, and that the pooled water increased the underlying dangerous condition of the road caused by the ruts. The Nebraska Supreme Court held as follows:

> Based on these facts, the trial court found that the underlying rutted condition of the road at the location of the

accident, and not the weather on February 14, 1992, was a proximate cause of Woollen's loss of control of his vehicle and ensuing collision into the culvert headwall, that is, the ruts on the road were a condition created over time which caused Woollen's accident, and his accident was not due to a temporary condition caused by nature due to the weather. *The trial court's findings are supported by evidence in the record, and we cannot say that they are clearly incorrect.* (Emphasis supplied.) *Id.* at 877, 593 N.W.2d at 739. The trial court went on to hold that as a matter of law, the State was not immune from suit because "the defective condition of the highway, rather than a temporary condition caused by nature due to weather conditions, caused the accident." *Id.* at 878, 593 N.W.2d at 739. "The trial court determined that the ruts were the underlying cause of Woollen's accident, separate and independent from the rain that was falling at the time Woollen lost control of his car and as such, that the ruts were a proximate cause of Woollen's accident and injuries." *Id.* On the review of the record, the Nebraska Supreme Court concluded that the trial court's findings were not clearly incorrect, and based on their independent review of the law, they affirmed the trial court's conclusion that the State was not immune from suit under § 81-8,219(10).

We find it necessary, as did the *Woollen* court, to distinguish *Hammond v. Nemaha Cty.*, 7 Neb. App. 124, 581 N.W.2d 82 (1998). In *Hammond*, applying § 81-8,219(10), we concluded that the State was immune from a suit for damages arising from a motorcycle accident on a rain-slickened, gravel detour road on which the passenger plaintiff claimed the State had failed to post warnings. The evidence in *Hammond* showed that the slickened condition of the road was obvious and that the motorcyclist, an experienced rider, had actual knowledge that the road surface was slick but, nevertheless, continued along the roadway. There was no evidence of negligent or defective maintenance of the road upon which the accident occurred. This court held that warnings about the conditions, of which the motorcyclist was aware and which were obvious, were not necessary.

Applying the foregoing law to the facts of the instant case, we hold that conditions caused by the operation of the snowblower

were the underlying cause of the Stinsons' accident, separate and independent from the wind and snow in the area at the time of the accident, and that the operation of the snowblower was a proximate cause of the accident and injuries. The trial court's findings are not clearly incorrect, and the City was not immune from suit under § 13-910(10).

We also note, for the sake of completeness, that § 13-910(10), by its terms, shall not be construed to limit a political subdivision's liability for any claim arising out of the operation of a motor vehicle by an employee of the political subdivision while acting within the course and scope of his or her employment. Whether a tractor with an attached snowblower qualifies as a motor vehicle is a question we need not answer, in light of our holding herein.

*Proximate Cause.*

The City assigns as error the district court's findings with regard to the proximate cause of the accident, arguing that the City's activities were appropriate and that Jack's actions were the proximate cause of the accident, or sufficient to bar recovery as a matter of law. The trial court found that the operator of the snowblower was negligent in operating against oncoming traffic when he admitted he had zero visibility and acknowledged that because of the operation of the snowblower, together with the snow being blown by the wind, oncoming traffic would not be able to see the equipment and that the oncoming traffic would have seen the blowing snow but not his vehicle. The trial court also found that the warning or flashing lights on the snowblower were of little significance because the lights would not be visible due to the blowing snow and that, in any event, the investigating officer observed none of the lights to be operating upon his arrival at the accident scene. The trial court determined that the accident occurred in an open area of Lincoln where blowing snow would be expected. While the trial court concluded that the primary proximate cause of the accident was the negligence of the City's operator, it also found that Jack was 15 percent negligent in driving into the blowing snow. Because the court found that the Stinsons were engaged in a joint enterprise at the time of the accident, it imputed Jack's negligence to Gladys and reduced her damages accordingly.

The City argues that the range of vision rule requires a finding that Jack was negligent and that such negligence was the proximate cause of the accident. Generally, it is negligence as a matter of law if one operates a motor vehicle on a public street or highway and, on account of the manner of operation, is unable to stop such operator's vehicle or turn that vehicle aside without colliding with an object or obstruction on the street or highway within the operator's range of vision. *Prime Inc. v. Younglove Constr. Co.*, 227 Neb. 423, 418 N.W.2d 539 (1988). The range of vision rule is applicable, notwithstanding that a motorist's vision is impaired by atmospheric or weather conditions, such as falling or blowing snow, rain, mist, or fog. *Id.* Such factors are held to be conditions and not intervening causes, and require drivers to exercise a degree of care commensurate with the attendant circumstances. *Tapp v. Blackmore Ranch*, 254 Neb. 40, 575 N.W.2d 341 (1998).

The range of vision rule finds its early application to collisions involving road equipment in *Most v. Cedar County*, 126 Neb. 54, 252 N.W. 465 (1934), which reversed a jury verdict for the plaintiff on the grounds that the plaintiff motorcyclist failed to stop his vehicle within his range of vision when he crested a hill and collided with a road grader operating in a forward direction in his lane of travel. Unlike the driver of the road grader in *Most*, the City's operator was traveling against traffic in a complete whiteout condition caused by the operation of the snowblower.

Since the decision in *Most, supra*, the Nebraska Supreme Court has recognized on several occasions that strict application of the range of vision rule as a matter of law is inappropriate where a reasonable dispute exists on the question of whether the operator of a vehicle exercised the requisite care and prudence under the circumstances. *Thurow v. Schaeffer*, 151 Neb. 651, 38 N.W.2d 732 (1949) (jury verdict for plaintiff upheld where plaintiff did not see combine partially blocking her lane of travel until she crested hill on country road traveling 60 m.p.h.). See, also, *Pool v. Romatzke*, 177 Neb. 870, 131 N.W.2d 593 (1964).

Similarly, in *Gatzemeyer v. Neligh Township*, 233 Neb. 329, 445 N.W.2d 593 (1989), the Nebraska Supreme Court determined that it is improper to apply the range of vision rule

where reasonable minds might differ as to whether the motorists are exercising due care under the circumstances. In *Gatzemeyer*, the plaintiff came over a steep hill and collided with a road grader with a lighted beacon operating beyond the crest of the hill in the wrong direction in the plaintiff's lane of travel. The court, in reversing summary judgment for the defendant, noted that the operator of the road grader had a duty to exercise reasonable care for the safety of others.

Finally, the Nebraska Supreme Court in *Traphagan v. Mid-America Traffic Marking*, 251 Neb. 143, 555 N.W.2d 778 (1996), a case decided under the new comparative negligence statute, Neb. Rev. Stat. § 25-21,185.09 (Reissue 1995), and applicable to the instant action, held that the range of vision rule did not control the outcome and that where reasonable minds may draw different conclusions and inferences regarding the negligence of the parties, the apportionment of negligence is for the finder of fact.

The City relies upon *Prime Inc., supra*, and *Tapp, supra*, in support of its argument. In *Prime Inc.*, a disabled semi-trailer truck was partially on the roadway of Interstate 80 and said vehicle was hit from behind due to blizzard conditions obstructing the view of the approaching driver. Before the accident, a state patrol unit had been stationed somewhere between 32 and 75 feet directly behind the disabled truck. The unit's rotating and flashing lights served to warn approaching motorists. The court in *Prime Inc.* held that under those circumstances, nothing relieved the approaching driver from the range of vision rule. In *Tapp*, a disabled vehicle left partially on the road was hit from behind by another vehicle. The driving conditions were good, but the approaching driver had the sun in his eyes and failed to exercise reasonable care under the circumstances.

The obvious distinction between the case at bar and those cited above is that none of those cases involved a collision with equipment that was completely invisible to oncoming traffic as a result of the operation of the equipment. In the instant case, the operator of the snowblower was aware that oncoming traffic would not be able to see his equipment and that it was dangerous to proceed against traffic in this fashion. The operation of the equipment was compounding the naturally occurring condi-

tions at the scene of the accident. There is evidence that Jack did slow his vehicle prior to entering the whiteout area and used reasonable care under the circumstances.

The issue of whether Jack was negligent in failing to stop his vehicle in time to avoid the collision with the City's equipment was an issue of fact, which was resolved by the trial court in its finding that Jack was 15 percent negligent in driving into the blowing snow.

As noted by the Nebraska Supreme Court in *Baldwin v. City of Omaha*, 259 Neb. 1, 18, 607 N.W.2d 841, 853 (2000), because the purpose of the comparative negligence law is

> to allow triers of fact to compare relative negligence and to apportion damages on that basis, the determination of apportionment is solely a matter for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by credible evidence and bears a reasonable relationship to the respective elements of negligence proved at trial.

The Nebraska Supreme Court recently addressed the issue of a plaintiff's contributory negligence in the case of *Carroll v. Chase County*, 259 Neb. 780, 612 N.W.2d 231 (2000), an action also brought under the Political Subdivisions Tort Claims Act. The plaintiff was injured after the automobile he was operating came over a hill on a county gravel road and collided with a road maintainer which was backing up the hill, against traffic, in the plaintiff's lane of traffic. The evidence revealed that the equipment operator was looking forward at the time of the accident, not in the direction of traffic approaching in his lane of travel from over the hill. While there was a warning sign which read " 'Road Construction 500 F[ee]t,' " *id.* at 782, 612 N.W.2d at 234, approximately 500 feet from the crest of the hill in the plaintiff's direction of travel, there were no other warnings or any other evidence of construction between the sign and the crest of the hill. The evidence further indicated that the plaintiff was traveling between 45 to 50 m.p.h. when he crested the hill and that the posted speed limit was 50 m.p.h. The plaintiff immediately applied his brakes, skidding for 183 feet before running into the back of the maintainer. The trial court found in favor of the plaintiff, holding that he was not negligent in any

manner and that the sole proximate cause of the accident was the negligence of the county. In affirming the trial court's judgment, the Nebraska Supreme Court found that the plaintiff was operating his automobile within the speed limit at a safe and appropriate speed, maintained a proper lookout, and conducted himself in a reasonable and prudent manner. The court concluded that the trial court was not clearly wrong when it found that the plaintiff was not negligent in any manner.

Considering all the evidence in a light most favorable to Gladys and giving her every inference which can reasonably be deduced from such evidence, we cannot say that the trial court was clearly wrong when it found that the primary proximate cause of the accident was the negligence of the City's operator and that of Jack to be 15 percent. We further find that the court's apportionment of negligence was supported by credible evidence.

*Other Assigned Errors.*

The City assigned other errors allegedly made by the district court. We decline to address those other assigned errors because they were not discussed in the City's brief. Not only must a claimed prejudicial error be assigned, it must also be discussed in the brief of the asserting party; an appellate court will not consider assignments of error which are not discussed in the brief. *In re Interest of Rachael M. & Sherry M.*, 258 Neb. 250, 603 N.W.2d 10 (1999); *Varela v. Fisher Roofing Co.*, 253 Neb. 667, 572 N.W.2d 780 (1998).

## CONCLUSION

We conclude that the City is not exempt from liability under either the Emergency Management Act or the Political Subdivisions Tort Claims Act and that the district court was not clearly wrong in finding that the primary proximate cause of the accident was the negligence of the City. Accordingly, we affirm.

AFFIRMED.

HANNON, Judge, dissenting.

I must respectfully dissent from the decision of the majority, but only from that portion of the opinion which considers the negligence of Jack and its effect. Jack knowingly and deliberately drove into swirling snow which would block his vision. I

would hold that as a matter of law, such a foolhardy act was contributory negligence, at least as great as the negligence of Crouse. Therefore, recovery is precluded under § 25-21,185.09.

I think that *Prime Inc. v. Younglove Constr. Co.*, 227 Neb. 423, 418 N.W.2d 539 (1988), and *Murray v. Pearson Appliance Store*, 155 Neb. 860, 54 N.W.2d 250 (1952), both hold that it is negligence as a matter of law to drive into snow that would block the driver's vision. The court in *Prime Inc.* returned the case to the jury to compare the defendant's negligence with the possible negligence of the plaintiff. Comparing negligence to contributory negligence is necessarily unique to each case, so there is no authority available to help compare the parties' negligence in this case.

In my opinion, Jack's act of driving into swirling snow where visibility was going to be practically zero is, as a matter of law, much more negligent than the possibly thoughtless method by which Crouse went about the necessary task of clearing snow from the City's streets. I would reverse the trial court's judgment and dismiss the cause.